IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| APOLLO HEALTHCARE CORP. d/b/a APOLLO HEALTH AND BEAUTY CARE<br><br>Plaintiff,<br><br>v.<br><br>SOL DE JANEIRO USA INC. and SOL DE JANEIRO IP, INC.,<br><br>Defendants.<br><br>SOL DE JANEIRO USA INC. and SOL DE JANEIRO IP, INC.,<br><br>Counterclaim-Plaintiffs,<br><br>v.<br><br>APOLLO HEALTHCARE CORP. d/b/a APOLLO HEALTH AND BEAUTY CARE and COSTCO WHOLESALE CORP.,<br><br>Counterclaim-Defendants. | Civil Action No.: 1:22-cv-07719-LLS |

**DECLARATION OF DR. ITAMAR SIMONSON SUMMARIZING**
<u>**TRIAL TESTIMONY OF DR. ITAMAR SIMONSON**</u>

I, Dr. Itamar Simonson, hereby declare as follows:

1.  The statements made in this declaration are based on my personal knowledge and are known by me to be true and correct. I am fully competent to provide this

declaration, which I offer to summarize my trial testimony.

2. I have been retained as an expert in the above-captioned case by counsel on behalf of the Counterclaim-Defendants Apollo Healthcare Corp. d/b/a Apollo Health and Beauty Care and Costco Wholesale Corp. (collectively, "Apollo").

3. I hold a Ph.D. in Marketing from the Duke University Fuqua School of Business, a master's degree in business administration (MBA) from the UCLA Graduate School of Management, and a Bachelor's degree with majors in Economics and Political Science from The Hebrew University.

4. I served as the Sebastian S. Kresge Professor of Marketing at the Graduate School of Business, Stanford University, from 1993 through 2020. Since the beginning of 2021, I have served as the Sebastian S. Kresge Emeritus Professor of Marketing at the Graduate School of Business, Stanford University. At Stanford University, I have taught MBA and executive courses on Marketing Management, covering such topics as brand management and brand equity, buyer behavior, developing marketing strategies, pricing, distribution channels, advertising, sales promotions, and retailing. I have also taught courses dealing with topics such as Marketing of High Technology Products/services, Business-to-Business Marketing, and Critical-Analytical Thinking. All doctoral courses that I have taught over the past 33 years have involved educating students regarding proper and improper ways to conduct and evaluate consumer and managerial decision-making studies. Attached as **Exhibit 1** is a true and correct copy of my report dated November 15, 2023, which includes additional background about me and my qualifications ("Expert Report").

5. My field of expertise is consumer behavior, marketing management, the role

of price, brand, and product features on consumer behavior, research methods, the design and analysis of consumer surveys and common survey mistakes, and human judgment and decision-making.

6.      Most of my research has focused on consumers' purchasing behavior, and the effects of product characteristics (such as brand name, price, and features), the competitive context, and marketing activities (such as promotions and advertising) on buying decisions.

7.      I have published numerous articles in my career dealing with topics such as consumer decision making, the role of brands, likelihood of confusion from the consumer's perspective, influences on consumers' decisions to start collections, consumer decision making in the age of the Internet, survey methods, and many other topics.

8.      I have conducted, supervised, or evaluated well over 2,000 marketing research studies dealing with various aspects of consumer behavior, covering topics such as branding, pricing, product configurations, marketing strategies, and advertising-related issues.  Based on this experience, as well as my education, teaching, participation in consumer-research conferences, and numerous projects with companies and students, I have developed expertise in how to design consumer surveys, how to conduct consumer surveys, problems and pitfalls that are common in consumer surveys, how to analyze the data from consumer surveys, and what the results of consumer surveys can—and cannot—show.  My surveys have been accepted in evidence and relied on in numerous trademark cases, including the Southern District of New York.

9.      My testimony will address a consumer survey that I designed and conducted to estimate the likelihood of confusion, if any, between Apollo's NUTRIUS® BRAZILIAN

3

BODY BUTTER CREAM product and Counterclaim-Plaintiffs Sol de Janeiro USA Inc. and Sol de Janeiro IP, Inc.'s (collectively, "SDJ") BRAZILIAN BUM BUM CREAM product. Given that this is a "forward confusion" case and that Apollo's product is primarily sold through Costco stores—which do not sell SDJ's product—a survey that represents typical marketplace conditions should show respondents Apollo's product and not SDJ's product, using the standard Eveready survey format. However, given that there is currently some overlap in the channels used for the two products (*e.g.*, both are sold on Amazon.com), I decided to implement a survey methodology that was most favorable to SDJ and involves showing respondents both products together. I refer to this survey methodology as an Aided Eveready, or side-by-side Eveready, methodology. My Expert Report details the design, methodology, execution, and results of my survey.

10.  The survey Test group showed a 5.6% confusion level and the survey Control group showed a 1.8% confusion level, for a net confusion estimate of 3.8%. Based on my survey results, it is my opinion that there is no confusion between the products at issue. My survey conservatively estimated the likelihood of confusion under the assumption that both parties' products are sold on the same website and are seen by consumers literally side-by-side, yet my survey results are consistent with a conclusion that there is no confusion between Apollo's product and SDJ's product.

11.  My trial testimony may also involve responses to any criticisms regarding my survey expressed by SDJ's expert, Dr. David Neal, to the extent Dr. Neal is permitted to present any such criticisms at trial.

12.  My testimony will also include an evaluation of a survey conducted on behalf of SDJ by Dr. Neal (the "Neal Survey"). The Neal Survey focused on the wrong consumer

universe, an error that was greatly exacerbated by the reliance on a biased methodology that suffered from severe "demand effects." Over 90% of sales of Apollo's product occur in Costco stores, and less than 1% of sales of Apollo's product are made on Amazon.com. Considering that Apollo's product is the allegedly infringing product in a "forward confusion" matter, it is purchasers of Apollo's product who represent the relevant universe. Accordingly, the conditions that represent where consumers purchase Apollo's product should determine the manner in which a likelihood of confusion survey is designed. The Neal Survey, which was purportedly designed to replicate the first results page on Amazon.com, completely fails to represent over 99% of the purchases of Apollo's product, which made the Neal Survey's universe and results completely unreliable.

13. Moreover, the Neal Survey imagined a situation in which respondents first see SDJ's product followed immediately by four other products including Apollo's product. Respondents were asked to identify the product/s that were made by the same company that made the SDJ product, were affiliated with it, or "needed permission" from SDJ. This procedure suffered from severe "demand effects" and was essentially a meaningless matching game whereby respondents used whatever clues/justification they could find to identify the "right answer/s." Unsurprisingly, this artificial game generated massive "confusion," with close to two-thirds of the Test group respondents selecting Apollo's product and almost half of the Control group respondents also providing answers suggesting "confusion" with Apollo's product, resulting in a net estimate of 15.1% "confusion."

14. Moreover, the produced "confusion" in the Neal Survey was not limited to Apollo's product, but included brands that are completely unrelated and have not been

5

accused of any infringement. For example, over 20% of all respondents provided answers suggesting that they were confused between the Body Shop product and SDJ's product. Further, the trade dress of the control product and the SDJ product have very little in common, which means that the measured "confusion" level for the control group should have been low. However, 46.3% of Dr. Neal's control group provided answers that Dr. Neal counted as indicating confusion. Notably, if one focuses on respondents who were more selective and identified just one product as related in some manner to SDJ, the resulting confusion estimate is just 2%, which is similar to the confusion estimate observed in my survey.

15. Additionally, to qualify for the Neal Survey, respondents had to be purchasers of "body butter cream." However, the exact meaning of the term "butter cream" was not provided, and Dr. Neal did not explain why this narrow, ill-defined term was relied upon instead of a simpler description (*e.g.*, "body moisturizing cream"). Dr. Neal's reliance on the narrow "butter cream" requirement meant that the resulting respondent universe was likely underinclusive. Notably, the Neal Survey asked respondents to evaluate "moisturizing creams," so it is unclear why the Neal Survey interviewed only those who said they purchase "butter creams." Additionally, the Neal Survey failed to include the relevant universe of purchasers of Apollo's product, who primarily buy the product at Costco stores. In fact, respondents were not even asked if they had ever shopped or expected to shop at Costco.

16. My testimony will also include my responses to the opinions of SDJ's expert, Dr. Thomai Serdari. Attached as **Exhibit 2** is a true and correct copy of my rebuttal report dated November 29, 2023 ("Rebuttal Expert Report").

ACTIVE 707509338v1

17. I understand the Court granted Apollo's summary judgment motion and dismissed Dr. Serdari's damages claim. However, if Dr. Serdari is allowed to testify at trial, my testimony may include the following points.

18. After reciting a few marketing concepts such as the 4 P's, the Serdari Report suggests that the SOL DE JANEIRO (SDJ) BRAZILIAN BUM BUM CREAM is a premium luxury product. This "conclusion" is not based on any consumer study and relies primarily on the company's "aspirational message" or positioning (Serdari Report, parags. 37-8). Of course, to the extent that Dr. Serdari believes that establishing the luxury, premium status of the brand is important for her assessment, she could have conducted (or asked a consumer researcher to conduct) a consumer study, but no such study was included or mentioned in the report. The Serdari Report (footnote 25) also acknowledges that her presented "analysis" is not based on any study, so Dr. Serdari suggests that she relied on an unrelated book that has nothing to do with SDJ or its product (or the alleged impact of Nutrius on SDJ's product):

> "An analysis of the SDJ brand has not been published in any academic sources yet. I relied on the work of Bernd Schmitt and Alex Simonson, *Marketing Aesthetics: The Strategic Management of Brands, Identity, and Image*, The Free Press, 1997, to form an understanding of what SDJ has been trying to achieve with its product's physical appearance and brand positioning. My initial analysis of the Sol de Janeiro brand generally and Brazilian Bum Bum Cream specifically were formed based on my own assessment of publicly available materials, such as the brand's website, distribution channels, price, marketing, etc. My analysis was then further confirmed by review of deposition testimony.

19. The Serdari Report discusses SDJ's advertising and distribution channels. It also provides Dr. Serdari's view of "mass beauty" products sold at stores such as Costco, focusing on Apollo's sales. The report does not present any evidence that shoppers of beauty products at Costco are aware of or pay attention to products sold at Sephora stores,

and in particular, are aware of and familiar with SDJ's Bum Bum product. Instead, the Serdari Report relies, for example, on distribution channels of showerheads as described in a case study (Serdari Report, page 25). Yet the report offers no evidence whatsoever regarding SDJ's brand or the alleged "harm" to SDJ due to the sale of Apollo's Nutrius product at Costco stores.

20. Putting aside the speculative claims of Dr. Serdari about the status and recognition of SDJ Bum Bum product among consumers (including Costco shoppers) and the lack of evidence of confusion or that there is something improper about selling allegedly competing brands at Costco stores, my evaluation of the Serdari Report will focus on three related issues. I will briefly discuss Dr. Serdari's assumption that consumers confuse Apollo's Nutrius product with SDJ's Bum Bum product. Next, I will examine the assumptions Dr. Serdari relies on as the bases for her proposed "corrective advertising campaign." I will then examine whether the presented "campaign" has any scientific basis, as opposed to being merely arbitrary numbers and ("high-level") plan taken "out of thin air."

21. Dr. Serdari relies on four false, detached from reality assumptions, namely that: (a) every shopper at Costco has been exposed and has paid attention to Apollo's product; (b) every shopper at Costco is aware of SDJ's product; (c) every shopper at Costco is a likely purchaser of SDJ's product; and (d) every shopper at Costco is confusing Apollo's product with SDJ's product.

22. I reserve my right to respond to any other questions elicited by SDJ at trial or to any new opinions offered by SDJ's experts at trial.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 17 day of February 2025 in Seattle.

_I. Simonson_
Dr. Itamar Simonson

State of Washington

County of King

This document was signed before me on this 17 day of February, By Dr. Itamar Simonson.

My commission expires: 10/14/2028.

X _[signature]_

```
Notary Public
State of Washington
AARON ANDERSON
LICENSE # 188531
MY COMMISSION EXPIRES
OCTOBER 14, 2028
```

9

ACTIVE 707509338v1