# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| APOLLO HEALTHCARE CORP. d/b/a/ | : | |
| APOLLO HEALTH & BEAUTY CARE, | : | |
| *Plaintiff,* | : | Case No.: **1:22-cv-07719** |
| v. | : | |
| SOL DE JANEIRO USA INC., and | : | |
| SOL DE JANEIRO IP, INC., | : | |
| *Defendants.* | : | |
| | : | |
| | : | |
| SOL DE JANEIRO USA INC., and | : | |
| SOL DE JANEIRO IP, INC., | : | |
| *Counterclaim-Plaintiffs,* | : | |
| v. | : | |
| APOLLO HEALTHCARE CORP. d/b/a/ | : | |
| APOLLO HEALTH & BEAUTY CARE, and | : | |
| COSTCO WHOLESALE CORP., | : | |
| *Counterclaim-Defendants.* | : | |

EXPERT REPORT OF JOHN G. PLUMPE

October 16, 2023

**HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY**

# Contents

I    INTRODUCTION                                                    4

II   ASSIGNMENT                                                      5

III  SUMMARY OF OPINIONS                                            6

IV   BACKGROUND                                                     8

  A    Allegations . . . . . . . . . . . . . . . . . . . . . . . . .     8

  B    Parties . . . . . . . . . . . . . . . . . . . . . . . . . . .     9

  C    The Accused Product, and The Trade Dress & Trademarks . . . . . .    13

  D    Brazilian Bum Bum Cream Press & Accolades . . . . . . . . . . . .    14

  E    Apollo & Costco Communications During Development of the Accused
       Product . . . . . . . . . . . . . . . . . . . . . . . . . . .    18

  F    Overview of Monetary Relief . . . . . . . . . . . . . . . . . .    20

V    COUNTERCLAIM-DEFENDANTS' PROFITS                              21

  A    Apollo's Accused Product Revenue . . . . . . . . . . . . . . .     22

  B    Apollo's Accused Product COGS, Certain Expenses & Profit . . . . .    22

  C    Costco's Accused Product Revenue . . . . . . . . . . . . . . .     23

  D    Costco's Accused Product COGS & Gross Profit . . . . . . . . . .     23

VI   HARM TO PLAINTIFF:
     REASONABLE ROYALTY DAMAGES                                   24

  A    Reasonable Royalty: Hypothetical Negotiation . . . . . . . . . . .    29

  B    Royalty Rate . . . . . . . . . . . . . . . . . . . . . . . .    31

     i     Personal Care Products (Toiletry Related) License Agreements     32

     ii    Sol de Janeiro's Benefits & Costs of Licensing the Trade Dress
           and Trademarks . . . . . . . . . . . . . . . . . . . . . .    36

iii    Sol de Janeiro's Willingness to License the Trade Dress and Trademarks . . . . . . . . . . . . . . . . . . . . .    39

iv    Apollo's Benefits of Licensing the Trade Dress and Trademarks    41

v    Royalty Rate Conclusion . . . . . . . . . . . . . . . . . . .    44

C    Royalty Base . . . . . . . . . . . . . . . . . . . . . . . . . . . .    47

D    Reasonable Royalty Damages . . . . . . . . . . . . . . . . . . . .    47

**VII    CONCLUSION**    **47**

# List of Tabs

1    Curriculum Vitae

2    List of Materials Considered

3    Apollo Accused Product Financial Data

4    Costco Wholesale Accused Product Financial Data

5    Reasonable Royalty Damages

6    Royalty Rate Data

7    Sol de Janeiro Brazilian Bum Bum Cream Financial Data

8    Sol de Janeiro Brazilian Bum Bum Cream Advertising & Marketing Spend Data

9    Sol de Janeiro Retailers

# I  INTRODUCTION

**1.** This is to report my findings to date regarding issues of monetary relief in Case No. 1:22-cv-07719 between Sol de Janeiro USA Inc. and Sol de Janeiro IP, Inc. (collectively, "Sol de Janeiro" or "Counterclaim-Plaintiffs") and Apollo Health-care Corp. d/b/a Apollo Health & Beauty Care ("Apollo") and Costco Wholesale Corp. ("Costco") (collectively, "Counterclaim-Defendants") regarding "Apollo and Costco hav[ing] imported, advertised, offered for sale, and sold the Accused Product [Brazilian Body Butter Cream] in the United States."[1]

**2.** I understand that Sol de Janeiro claims that Counterclaim-Defendants' advertising and selling of the skin care product called Brazilian Body Butter Cream (the "Accused Product") infringes Sol de Janeiro's trade dress and trademarks.[2]

**3.** I am a Managing Director of Epsilon Economics ("Epsilon"), an economic consulting firm. I hold Bachelor of Science and Master of Science degrees in Mechanical Engineering from the University of Illinois and a Master of Business Administration degree from the University of Chicago Booth School of Business, where I graduated with honors.

**4.** Since 1999, my practice has focused on the analysis of damages, monetary relief, and valuation issues in complex commercial disputes and transactions, including trademark, false advertising, copyright, trade secret and other intellectual property and breach of contract matters. I have written articles and spoken extensively to

---

[1] Answer to Second Amended Complaint and Amended Counterclaims of Defendants, August 24, 2023, paragraphs 158 and 163.
The specific asserted counterclaims are: (1) Trade Dress Infringement Under 15 U.S.C. §1125(a), (2) Unfair Competition Under 15 U.S.C. §1125(a) (use of infringing trade dress), (3) Contributory Trade Dress Infringement, (4) Unfair Competition Under New York Common Law (use of infringing trade dress), (5) Trademark Infringement Under 15 U.S.C. §1114(1)(a), (6) Unfair Competition Under 15 U.S.C. §1125(a) (use of infringing trademark), (7) Contributory Trademark Infringement, and (8) Unfair Competition Under New York Common Law (use of infringing trade dress) (Answer to Second Amended Complaint and Amended Counterclaims of Defendants, August 24, 2023, paragraphs 178-223).

[2] "Apollo and Costco have imported, advertised, offered for sale, and sold the Accused Product in the United States" (Answer to Second Amended Complaint and Amended Counterclaims of Defendants, August 24, 2023, paragraph 163).

Highly Confidential — Attorneys' Eyes Only                                        5

various professional organizations and law schools on subjects such as intellectual property damages, defendant's profits, reasonable royalties, and valuation. I have testified at trial in federal district court, in deposition, and in arbitration on issues including intellectual property monetary relief, breach of contract damages, licensing, and valuation.

5. I am active in the International Trademark Association ("INTA"), in which I have held leadership positions for many years. My participation in INTA includes being the co-Chair of the 2022 Presidential Task Force on Intellectual Property Reporting, as well as involvement in the Brand Valuation Project Team and the IP Accounting & Brand Valuation Standards Project Team. I was selected to the World Intellectual Property Organization's ("WIPO") 2023 Expert Consultative Group on Valuation of Intangible Assets. In addition, I am on the Board of Directors of Lawyers for the Creative Arts, which provides pro bono legal assistance to clients in all aspects of the visual, literary, and performing arts.

6. A copy of my curriculum vitae is attached as Tab 1. Epsilon is compensated for my work in this matter at the rate of $645 per hour and for the work of other staff members at their hourly rates. No part of any compensation to Epsilon is affected by the outcome of this case.

# II  ASSIGNMENT

7. Epsilon has been retained by Fross Zelnick Lehrman & Zissu, P.C. ("Counsel") on behalf of Sol de Janeiro. I have been asked to review documents and conduct research for the purpose of providing economic/financial analyses and opinions related to monetary relief for the counterclaims asserted by Sol de Janeiro against Counterclaim-Defendants.

8. In conducting my analysis, I reviewed various documents, including legal filings, depositions, pleadings, an expert report, written discovery, and financial infor-

mation, as well as publicly-available information gathered through my research. I also relied on my more than 24 years of experience working with hundreds of companies on trademark licensing, valuation, and monetary relief issues. A list of materials I considered in forming the opinions set forth in this Expert Report is attached as Tab 2. I also had a discussion with Haley Menkis, Brand & Product Consultant for Sol de Janeiro. I expect that I may be asked to update this report and/or to provide rebuttal opinions if any parties or third-party witnesses provide additional information, documents, testimony, or expert reports in connection with this proceeding.[3]

9. I have been asked to assume the validity of Sol de Janeiro's asserted trade dress and trademarks, that the ownership or rights to use and/or license these resides with Sol de Janeiro, and that Counterclaim-Defendants will be found liable for the counterclaims made by Sol de Janeiro concerning the Accused Product.[4] I do not express opinions on legal issues or factual allegations in this matter.

# III   SUMMARY OF OPINIONS

10. Based on my analysis of the documents and other information produced in this matter, my research, and my education and experience, I have determined:[5]

- Apollo realized net sales of $14.43 million from selling the Accused Product in the U.S. during the period from June 2022 through July 2023;[6]

- To estimate Apollo's profits from selling the Accused Product, I deducted an

---

[3] I reserve the right to modify or supplement this report, as appropriate and allowed by the Court, after the receipt of additional documents, data, information, testimony, or expert reports. In connection with my anticipated testimony in this matter, I may use as exhibits various documents produced in this litigation which refer or relate to the matters discussed in this report. In addition, I may create or assist in the creation of certain demonstrative exhibits to accompany my testimony.

[4] My understanding is that liability would involve a determination that a likelihood of confusion exists involving the Accused Product and the trade dress and marks asserted by Sol de Janeiro.

[5] This opinion may be supplemented based on additional information, expert reports, deposition transcripts, or other data that may be made available to me in the future. I reserve the right to update my analysis if additional records, data, or information are furnished to me.

[6] *See*, Tab 3.

Highly Confidential — Attorneys' Eyes Only                                                                    7

estimate of Apollo's cost of goods sold for the Accused Product and its expenses in advertising the Accused Product and in reimbursing Costco for implemented price discounts, which result in Apollo profits from selling the Accused Product in the U.S. of $6.06 million during the period from June 2022 through July 2023;[7]

- Costco realized net sales of $13.05 million from selling the Accused Product in the U.S. (covering the date range from January 1, 2022 through August 6, 2023);[8]

- To estimate Costco's gross profits from selling the Accused Product, I deducted Costco's cost of goods sold, referred to by Costco as "Cost (Apollo)," for the Accused Product, which results in Costco gross profits from selling the Accused Product in the U.S. of $1.57 million (covering the date range from January 1, 2022 through August 6, 2023);[9] and

- If the fact-finder determines that Sol de Janeiro has been harmed by the actions of Counterclaim-Defendants and that reasonable royalty damages are an appropriate means to compensate Sol de Janeiro for that harm — a reasonable royalty can be calculated as: royalty base × royalty rate. An appropriate royalty base would be Apollo's net sales of the Accused Product in the U.S., and the royalty rate applied to the royalty base would be at least 8%.[10] The resulting reasonable royalty damages are at least $1.15 million.[11]

**11.** The remainder of this report and attached tabs describe the bases and analyses underlying the above conclusions, based on the information and data presently available to me.[12]

---

[7] *See*, Tab 3.

[8] *See*, Tab 4.

[9] *See*, Tab 4.

[10] For my analysis, I have modeled that Apollo would bear the royalty burden, and thus could sell its Brazilian Body Butter Cream to the customers that it did without infringing.

[11] Calculation: $1.15 million = royalty base ($14.43 million) × royalty rate (at least 8%). *See*, Tab 5.

[12] In connection with my anticipated testimony in this matter, I may use as exhibits various docu-

# IV   BACKGROUND

## A   Allegations

**12.** Sol de Janeiro asserts that after it obtained exclusive rights to the Trade Dress and Trademarks, as defined below, Apollo began manufacturing, advertising, importing, and selling the Accused Product in the U.S., which "blatantly trades off the renown of" the Trade Dress and Trademarks and, thus, confuses consumers.[13] Sol de Janeiro further asserts that Costco, which is one of the customers to whom Apollo has sold the Accused Product, has advertised and sold the Accused Product in the U.S.[14]

**13.** I understand that Sol de Janeiro believes that Apollo and Costco are infringing the Trade Dress and Trademarks to:

- Mislead consumers into believing that Brazilian Body Butter Cream (the Accused Product) and Brazilian Bum Bum Cream "are one and the same, or that Brazilian Body Butter Cream is made, approved, sponsored, or otherwise endorsed by Sol de Janeiro, or that the parties are somehow connected;"[15]

- Pass off the Accused Product as Sol de Janeiro's product, and otherwise benefit from the recognition and goodwill of the Trade Dress and Trademarks;[16]

- Confuse and mislead consumers, create a false impression as to the source and sponsorship of the Accused Product, divert business from Sol de Janeiro, pass off

---

ments produced in this litigation which refer or relate to the matters discussed in this report. In addition, I may create or assist in the creation of certain demonstrative exhibits to accompany my testimony. I have not yet selected or created such exhibits.

[13] Answer to Second Amended Complaint and Amended Counterclaims of Defendants, August 24, 2023, paragraph 158.

[14] Answer to Second Amended Complaint and Amended Counterclaims of Defendants, August 24, 2023, paragraph 163.

[15] Answer to Second Amended Complaint and Amended Counterclaims of Defendants, August 24, 2023, paragraph 165.

[16] Answer to Second Amended Complaint and Amended Counterclaims of Defendants, August 24, 2023, paragraph 166.

the Accused Product as being authorized, and/or otherwise falsely misrepresent the nature and quality of the Accused Product;[17] and

- Target and seek to sell the Accused Product to Sol de Janeiro's existing and potential customers who are familiar with the Trade Dress and Trademarks.[18]

## B    Parties

### Sol de Janeiro — Counterclaim-Plaintiff

**14.** Sol de Janeiro is a skin and body care brand and company founded in 2014.[19] Its first three products, including Brazilian Bum Bum Cream, were launched in 2015.[20]  The brand was inspired by the Brazilian attitude towards beauty.[21] Ms. Yang, the Co-Founder and Chief Executive Officer of Sol de Janeiro,[22] "was inspired by a round bottom jar, because it felt connected to the appreciation for curves in Brazil and in Rio...a bit of an eureka moment."[23]  In April 2015, Sol de Janeiro launched its best-selling, now "cult-favorite," product named Brazilian Bum Bum Cream.[24] Brazilian Bum Bum Cream is an award-winning body cream intended to hydrate, soften, and visibly tighten the appearance of skin.[25]

**15.** Ms. Yang testified that the "overall shape [of the Brazilian Bum Bum

---

[17] Answer to Second Amended Complaint and Amended Counterclaims of Defendants, August 24, 2023, paragraph 166.

[18] Answer to Second Amended Complaint and Amended Counterclaims of Defendants, August 24, 2023, paragraph 167.

[19] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), page 81; and <www.soldejaneiro.com/pages/our-story>.

[20] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), pages 82-83.

[21] <www.soldejaneiro.com/pages/our-story> — "In Brazil, beautiful isn't a standard but an attitude. It's the confidence from feeling good in your skin."

[22] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), page 5.

[23] Deposition of Haley Menkis (Brand & Product Consultant for Sol de Janeiro), September 8, 2023 (Exhibits 1-21), page 113.

[24] Answer to Second Amended Complaint and Amended Counterclaims of Defendants, August 24, 2023, paragraph 134.

[25] <www.soldejaneiro.com/products/brazilian-bum-bum-cream>.

Cream jar]... was very, very important to the brand;"[26] "[w]e had an entire manifesto we wrote about the brand;"[27] and "[e]verything that we did had to have curves. The round bottom of this jar was an absolutely critical decision... celebrating everyone's curves."[28] She further testified that selecting the Brazilian Bum Bum Cream name "was a critical decision for our company, and so it was a combination of the name, Brazilian Bum Bum cream, and the shape of the jar, and then the yellow color;"[29] the "shape of the jar really amplifies the brand's personality;"[30] "we have a unique name which we worked very hard to come up with, and we said, let's shout it out. Why be subtle? Again, let's be bold;"[31] and the "shape [of the jar] has also become a very, very clear indication of our cream."[32]

**16.** Sol de Janeiro's U.S. annual revenue from selling Brazilian Bum Bum Cream has grown from approximately $2 million in 2016 to over $34 million in 2022.[33] In generating these sales, Sol de Janeiro has expended over $8 million in online advertising and marketing over the time period 2018 through PY 2023,[34] plus an additional approximately $1.5-$2 million per year in other Brazilian Bum Bum Cream advertising and marketing in 2020-2022.[35]

---

[26] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), page 103.

[27] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), page 104.

[28] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), pages 122-123.

[29] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), page 125.

[30] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), page 165.

[31] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), page 173.

[32] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), page 181.

[33] *See*, Tab 7. There are two stock keeping units ("SKUs") for Sol de Janeiro's Brazilian Bum Bum Cream — SJ99210200 is a 240 mL container with a suggested retail price ("SRP") of $48, and SJ99210202 is a 75 mL container with a SRP of $22 (*see*, SDJ0001655).

[34] *See*, Tab 8. Nearly 90% of the spend has been with Google, Facebook, and TikTok. I understand that this spend is associated with only Brazilian Bum Bum Cream, as well as when Brazilian Bum Bum Cream is grouped with other Sol de Janeiro products (Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), page 232).

[35] The additional marketing and advertising is calculated as Sol de Janeiro's "Total Channel Mar-

Highly Confidential — Attorneys' Eyes Only                                                11

17. Brazilian Bum Bum Cream is sold throughout the U.S. in both physical and online stores.[36] It has been sold in approximately 1,100 physical locations, with the primary historical brick-and-mortar ("B&M") retailers being Sephora and Sephora in JCPenney ("SiJPC").[37] Regarding Sol de Janeiro's U.S. retail customers: four are B&M only, six are a combination of B&M and online, and seven are online only (including Amazon and the company's website, www.soldejaneiro.com).[38]

18. L'Occitane acquired a majority interest in Sol de Janeiro in December 2021 for a purchase price of $450 million.[39]

### Apollo and Costco — Counterclaim-Defendants

19. Apollo is a Canadian private (or control) label personal care product company that develops and manufactures products for specialty and department store clients, as well as manufactures products on a contract basis.[40] Apollo's skin and body care products lines are: liquid soap & sanitizers, body wash, hair care, skin care, specialty bath, kids & baby, and nutraceuticals.[41] Apollo manufactures and distributes its personal care products for companies such as Wal-Mart and Target.[42] Apollo's Accused Product is sold in both physical and online stores, including but not

---

[36] keting" annual expense (which was allocated to Brazilian Bum Bum Cream based on its share of Sol de Janeiro's total revenue) from Tab 7 *less* the corresponding years' online spend from Tab 8. Calculations: $3.02 million – $0.97 million (2020), $3.98 million – $2.20 million (2021), and $4.71 million – $3.25 million (2022).

[36] *See*, Tab 9; and Answer to Second Amended Complaint and Amended Counterclaims of Defendants, August 24, 2023, paragraph 149.

[37] *See*, Tab 9. I understand that Sephora's contract with JCPenney has expired, and that Kohl's and Sephora signed a long-term partnership to put Sephora shops in Kohl stores ("Sephora signs contract with Kohl's as it plans to phase out of J.C. Penney," The Dallas Morning News, December 1, 2020). I understand that Sol de Janeiro's products are currently carried in 886 Kohl's stores, and no JCPenney stores (Interview of Haley Menkis, Brand & Product Consultant for Sol de Janeiro).

[38] *See*, Tab 9. Sol de Janeiro has an exclusivity arrangement with Sephora where Sol de Janeiro agreed to not sell outside of Sephora, beyond certain "grandfathered" stores, which includes Amazon (Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), page 61).

[39] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), pages 93 and 95.

[40] <www.apollocorp.com/about>.

[41] <www.apollocorp.com/products>.

[42] <www.apollocorp.com/distribution>.

limited to big-box retailers (*e.g.*, Costco and Sam's Club) and websites (*e.g.*, Amazon and www.costco.com).[43]

**20.**  Based on financial data produced by Apollo, from June 2022 through July 2023, it realized U.S. net sales of approximately $14.43 million from selling its Brazilian Body Butter Cream to, for example, Costco, Sam's Club, BJ Wholesale Club, and Amazon Market Place.[44]

**21.**  Costco Wholesale Corporation operates "membership warehouses and e-commerce websites based on the concept that offering members low prices on a limited selection of nationally-branded and private-label products in a wide range of categories will produce high sales volumes and rapid inventory turnover. When combined with the operating efficiencies achieved by volume purchasing, efficient distribution and reduced handling of merchandise in no-frills, self-service warehouse facilities, these volumes and turnover enable [Costco] to operate profitably at lower gross margins than most other retailers."[45]  Costco buys most of its "merchandise directly from manufacturers and routes it to consolidation points (depots) or directly to [its] warehouses. . . This process creates freight volume and handling efficiencies, lowering costs associated with traditional multiple-step distribution channels."[46]  For its e-commerce operations, Costco ships merchandise through its depots, as well as through drop-ship and other delivery arrangements with its suppliers.[47]

**22.**  Costco operates approximately 575 warehouses in the U.S.[48] For its fiscal year 2022, Costco's U.S. revenues and operating income were $165.29 billion and $5.27 billion, respectively.[49]

**23.**  Based on financial data produced by Costco (covering the date range from

---

[43] Answer to Second Amended Complaint and Amended Counterclaims of Defendants, August 24, 2023, paragraph 150; and Apollo0003215.

[44] *See*, Tab 3.

[45] Costco Wholesale Corporation, Form 10-K, for the fiscal year ended August 28, 2022, page 3.

[46] Costco Wholesale Corporation, Form 10-K, for the fiscal year ended August 28, 2022, page 3.

[47] Costco Wholesale Corporation, Form 10-K, for the fiscal year ended August 28, 2022, page 3.

[48] Costco Wholesale Corporation, Form 10-K, for the fiscal year ended August 28, 2022, page 19. As of August 28, 2022.

[49] Costco Wholesale Corporation, Form 10-K, for the fiscal year ended August 28, 2022, page 63.

January 1, 2022 through August 6, 2023), it realized U.S. net sales of approximately $13.05 million from selling Brazilian Body Butter Cream.[50]

## C    The Accused Product, and The Trade Dress & Trademarks

**24.** The Sol de Janeiro Brazilian Bum Bum Cream product design "includes a colored jar that has no writing on it which is gently rounded at its bottom; a large, overhanging lid that extends nearly half the height of the product and protrudes outward over the jar body (rather than screwing flush); a color-block combination of yellow and white components; the product name presented in capitalized dark-gray lettering framed by smaller text above and below."[51] The resulting product design (the "Trade Dress") is shown below:[52]



**25.** The following figure is a side-by-side presentation of Sol de Janeiro's Brazilian Bum Bum Cream and the Accused Product.

---

[50] *See*, Tab 4.

[51] Answer to Second Amended Complaint and Amended Counterclaims of Defendants, August 24, 2023, paragraph 137.

[52] Answer to Second Amended Complaint and Amended Counterclaims of Defendants, August 24, 2023, paragraph 137.

Highly Confidential — Attorneys' Eyes Only                                    14

**Brazilian Bum Bum Cream**

**Brazilian Body Butter Cream
The Accused Product**

 

**26.** Since its launch in 2015, Sol de Janeiro has marketed and sold its Brazilian Bum Bum Cream product under the marks BRAZILIAN BUM BUM and BRAZILIAN BUM BUM CREAM (together, the "Trademarks"). Sol de Janeiro owns U.S. Registration No. 5,640,212 for the mark BRAZILIAN BUM BUM.[53]

## D    Brazilian Bum Bum Cream Press & Accolades

**27.** From its inception, I understand that Sol de Janeiro sought to develop "a unique jar and packaging for its Brazilian Bum Bum Cream that reflected the Brazilian body-positivity and beach culture that inspired the brand."[54] In an interview with *InStyle* in 2021, Camila Pierotti described how the company designed the packaging to disrupt industry norms — "We knew the jar had to be beautiful and impactful and we wanted it to be yellow with a rounded bottom and chunky cap."[55]

**28.** As discussed herein, Sol de Janeiro believes that due to the millions of dollars it has expended advertising, marketing, and promoting Brazilian Bum Bum

---

[53] Answer to Second Amended Complaint and Amended Counterclaims of Defendants, August 24, 2023, paragraph 139; and <www.tmsearch.uspto.gov/>. Details of the registration include: Goods and Services — body cream, First Use and First Used in Commerce — April 2015, Registration Date — January 2019, and Owner — Sol de Janeiro.

[54] Answer to Second Amended Complaint and Amended Counterclaims of Defendants, August 24, 2023, paragraph 136.

[55] "The Body Care Brand that Brings a Sunny Brazilian Beach to Your Bathroom," InStyle, September 15, 2021.

Cream;[56] the media coverage of Brazilian Bum Bum Cream discussed, in part, below; the over $100 million in Brazilian Bum Bum Cream sales;[57] and the "buzz" associated with Brazilian Bum Bum Cream, Sol de Janeiro's Trade Dress and Trademarks have become well-known nationwide in the beauty industry and among consumers, who have come to associate the Trade Dress and Trademarks with Sol de Janeiro.[58] Speaking about the results of a Boston Consulting Group study of Brazilian Bum Bum Cream (which was done in conjunction with L'Occitane's acquisition of Sol de Janeiro), Ms. Menkis stated, "[h]aving forty-nine percent of people aware of [Brazilian Bum Bum Cream] in this case sample is really strong for a brand that has limited distribution, and is only . . . nine years old, that's good data."[59] This same study states that "Sol de Janeiro is recognized for its iconic packaging."[60]

29. Further, since 2015, the number of Brazilian Bum Bum Cream impressions presented to consumers has been nearly 9 billion.[61] Also, Ms. Yang testified regarding the types of media coverage enjoyed by Sol de Janeiro and Brazilian Bum Bum Cream:

---

[56] *See*, Tab 7 and Tab 8. Sol de Janeiro does "all elements of digital marketing, sampling, influencer marketing, E-commerce-related marketing, like e-mails, the whole gamut" (Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), page 228). Ms. Menkis described the different ways that Sol de Janeiro markets Brazilian Bum Bum Cream as:

> So we do press, we do influencer, both macro and micro. . . We do sampling, we do digital advertising, prospecting and recruiting, we do e-mail marketing, we do text message marketing, we advertise in the Sephora stores. So we have — again these are produced, we have, you know, big displays that have large images of Brazilian Bum Bum Cream being held by a woman or something like that. They change all the time. We have done advertising in the windows of Sephora stores. We have done advertising in the form of mobile pop-ups. . . We do out-of-home advertising, so like on a bus shelter or in Times Square. We do social media advertising, Facebook, TikTok, Instagram, Pinterest, YouTube. We have done some streaming service advertising. . .

(Deposition of Haley Menkis (Brand & Product Consultant for Sol de Janeiro), September 8, 2023 (Exhibits 1-21), pages 196-197).

[57] *See*, Tab 7.

[58] Interview of Haley Menkis, Brand & Product Consultant for Sol de Janeiro.

[59] Deposition of Haley Menkis (Brand & Product Consultant for Sol de Janeiro), September 8, 2023 (Exhibits 1-21), pages 273 and 288.

[60] SDJ 0001656–SDJ 0001676, at SDJ 0001656.

[61] Sol de Janeiro Bum Bum Cream Breakdown + North American Press Influencer, SDJ 0001563– SDJ 0001567, at SDJ 0001563. I understand that an "impression is a metric used to quantify the number of digital views or engagements of a piece of content, usually an advertisement, digital post, or web page" (<www.investopedia.com/terms/i/impression>).

Highly Confidential — Attorneys' Eyes Only                                      16

Online articles, TV shows, online media, like podcasts, and from day 1, we were able to present our brand and the products to these editors and these media platforms, and they would love it because of how we looked.  So the Brazilian Bum Bum cream was very easy to get media coverage because of the whole package, the name, the design, the color, and then, of course, the smell and the product, but we got ton of coverage because of that organically.[62]

**30.** Brazilian Bum Bum Cream has been regularly featured in the press and discussed in social media, has solicited and unsolicited celebrity endorsements, and has been included in various "sponsorships."  I understand that Sol de Janeiro has compiled examples of these in Sol de Janeiro Bum Bum Cream Breakdown + North American Press Influencer, SDJ 0001563–SDJ 0001567.[63]

---

[62] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), page 237.

[63] For example:

- Press Features:

  - 2023: People (Selena Gomez Uses This Viral Moisturizing Cream That Makes My Dry Skin Feel as Smooth as Velvet), Women's Health (74 Best Gifts For Your Sister In 2023: Fun, Thoughtful Mother's Day And Birthday Gift Ideas She'll Love), US Weekly (7 Valentine's Day Gifts — As Inspired by Celebs' Favorite Products), Byrdie (The 10 Best Scented Lotions That'll Leave You Smelling Amazing), Harper's BAZAAR (The 13 Best Tightening Creams for Firmer-Looking Skin), Allure (12 Body Products (and Then Some) That Won 2023 Readers' Choice Awards), Good Morning America (Get glowing with these top-rated body butters, lotions and more for cold winter months);

  - 2022: E! Online (Every Time I Wear This Lotion, I Get So Many Compliments on How Great I Smell), Harper's BAZAAR (The 13 Best Tightening Creams for Firmer-Looking Skin), People (Selena Gomez Posted a TikTok in a Towel Using the Firming Cream with More Than 20,000 Perfect Ratings), SHAPE (Selena Gomez Just Used the Body Cream Hilary Duff and Hailey Bieber Also Love), T: The New York Times Magazine (How Quinta Brunson Gets Her Skin Ready for 'Abbott Elementary'), Us Weekly (Hailey Bieber Once Raved About This Iconic Body Cream: 'Obsessed'), WhoWhatWear (This TikTok-Viral Brand Unlocks Firm, Smooth and Good-Smelling Skin), Women's Health (The 23 Best Cellulite Creams That Actually Work–And 7 Other Transformative Treatments);

  - 2021: Allure (The 23 Best Body Lotions and Moisturizers to Soothe Dry Skin), InStyle (A Tub of This "Heavenly" Cream Sells Every 14 Seconds and After Reading Reviews We Understand Why), InStyle (The Body Care Brand That Brings a Sunny Brazilian Beach to Your Bathroom), Marie Claire (The 22 Best Cellulite Creams for Smooth, Firm Skin), The Cut (The Scent-Obsessed Gift Guide), Women's Health (Why This TikTok-Famous Butt Cream Is Totally Worth The Hype); and

**31.** Additionally, subsequent to launch, Brazilian Bum Bum Cream began to appear (and continues to appear) on various best-of type lists. Illustrative examples include:[64]

- *Southern Living*'s "2016 Beauty Awards" (2016);[65]

- *NewBeauty*'s "Best Skin Smoothing Body Lotion" (2016);[66]

- *NewBeauty*'s "2017 NewBeauty Awards: 20 Everyday Beauty Essentials That Fit Into Every Woman's Routine" (2017);[67]

- *NewBeauty*'s "NewBeauty Award Winners: Glowing Skin Is Always In" (2018);[68]

- *Vogue*'s "The Vogue Beauty Awards 2018" (2018);[69]

- *influenster*'s Reviewer's Choice Winner for "Best Overall Cellulite Cream" (2019);[70]

---

      – 2020: Allure (The Sol de Janeiro Brazilian Bum Bum Cream Smells Like Vacation in a Jar), Byrdie (There's No Magic Cure for Cellulite, But These Creams Definitely Help), ELLE (15 Top-Rated Cellulite Creams Amazon Reviewers Can't Shut Up About), Glamour (Sol de Janeiro Bum Bum Cream Review: Why It's Worth The Money), and VOGUE (The Best Body Lotion for Better Skin in 2020)

- Unsolicited Celebrity Endorsements: Olivia Culpo (E! Online), Bethenny Frankel (TikTok), Alix Earle (Amazon Store Front), Selena Gomez (TikTok), Hailey Bieber (US Weekly), Quinta Brunson (NY Times), Sabrina Carpenter (Vogue), Shawn Mendes (Refinery29), and Hillary Duff (NY Times); and

- Sponsorships (*e.g.*, award dinner gift bags, and events): Sports Illustrated Gift Bag, Cannes VIP Gifting Suite, Dolce Vita Influencer Trip to Jamaica, Influencer Trip: Tarte, Coachella, Lookfantastic Pop-Up, Gisele at the MET Gala, NYFW Gifting, Bridal Gifting (Bri Martinez's IG story), Variety Gift Bag, Miami Swim Week, Chelsea Film Festival, Anitta Sephora Event, 5th Annual We Dare to Bare Fitness Festival, European Masterclass Tour, NBC News – Megyn Kelly, and Carioca Sunga Co. Swimsuits.

[64] Each of these awards or best-of lists contain the Trademarks and the majority show the Trade Dress in some manner. *See also*, SDJ 0001652 (Brazilian Bum Bum Cream Awards).

[65] SDJ 0001652 (Brazilian Bum Bum Cream Awards).

[66] SDJ 0001652 (Brazilian Bum Bum Cream Awards).

[67] SDJ 0000498–SDJ 0000507.

[68] <www.web.archive.org/web/20200809112223/https://www.newbeauty.com/awards-glow-getters/>.

[69] <www.vogue.co.uk/gallery/vogue-beauty-awards-winners>.

[70] <www.web.archive.org/web/20201205221109/https://www.influenster.com/awards/2019/winners>.

Highly Confidential — Attorneys' Eyes Only                                            18

- *allure*'s Reader's Choice Award Winner in the body category (2020);[71]

- *Harper Bazaar*'s "The 13 Best Creams for Cellulite and Stretch Marks" (2020);[72]

- *ESSENCE*'s "Best in Black Beauty 2020: Body Care" (2020);[73]

- *Her Campus*'s "College Beauty Awards: 16 Body Products That Feel Like Absolute Luxury" (2020);[74]

- *Glamour*'s 2020 Readers' Choice Awards (2020);[75]

- *Marie Claire*'s "The 22 Best Cellulite Creams for Smooth, Firm Skin" (and labeled cult favorite) (2021);[76]

- *Star Magazine*'s Beauty Awards: "Cult Favorites" (2022);[77]

- *New York Post*'s "21 best body butters we tested in 2022 for smooth, hydrated skin" (2022);[78] and

- *Harper Bazaar*'s "Body Icon" in the article "The Next Generation of Iconic Beauty Products" (2022). The article states that "Brazilian Bum Bum Cream has been Sephora's best-selling body cream for six years—and it has more than 50,000 five-star reviews worldwide."[79]

## E  Apollo & Costco Communications During Development of the Accused Product

32. On November 27, 2020, Lindsay Bubitz (Buyer, Health and Beauty Aids, Costco Wholesale) sent Sol de Janeiro a message through its website form stating, "I

---

[71] SDJ 0000555–SDJ 0000573.
[72] SDJ 0000574–SDJ 0000581.
[73] SDJ 0000582–SDJ 0000617.
[74] SDJ 0000618–SDJ 0000636.
[75] <www.glamour.com/story/glamour-beauty-awards-readers-choice-skin-nominees>.
[76] SDJ 0000637–SDJ 0000645.
[77] SDJ 0001652 (Brazilian Bum Bum Cream Awards).
[78] SDJ 0000646–SDJ 0000670.
[79] SDJ 0000671–SDJ 0000721.

Highly Confidential — Attorneys' Eyes Only                                                      19

was wondering if we could set up a meeting to discuss possibly carrying your product!
I am a huge fan of the Bum Bum Cream and Body Wash. Please let us know if we
can set up a meeting."[80]   I understand that other than a "canned" response email
from Sol de Janeiro, there was no follow-up from Sol de Janeiro.[81]

**33.**   Thereafter, a series of email communications between Costco and Apollo
discuss Apollo's development of the Accused Product (at Costco's request), with ref-
erence to Brazilian Bum Bum Cream.  Development of the Accused Product appears
to have started in mid-2021 and been completed by year-end 2021.  These email
communications include:

- June 29, 2021: from Ms. Bubitz to Charles Wachsberg (Chief Executive Officer,
  Apollo) states, "Could you create a body cream that would be similar to this
  one?", and includes a picture of Brazilian Bum Bum Cream;[82]

- June 30, 2021: from Mr. Wachsberg to Ms. Bubitz has the subject as "Brazilian
  Bum Bum Cream comparable," and states, ". . . given the specific name recogni-
  tion associated with 'Brazilian Bum Bum Cream', I'm thinking you may wish to
  focus on this particular equity in commercializing this opportunity for optimal
  awareness and success;"[83]

- July 20, 2021: from Mr. Wachsberg to Ms. Bubitz states, "Our product will
  delight and will capture the entire sensorial and skin feel/performance of the
  target 'Bum Bum' brand, and more. . . ;"[84]

- August 9, 2021: from Mr. Wachsberg to Ms. Bubitz states, "The jars resemble
  the brand as well and these would be used to create the desired selling unit

---

[80] SDJ 0001820–SDJ 0001821.

[81] Deposition of Lindsay Bubitz (Costco Buyer), August 25, 2023 (Exhibits 1-39), page 21. *See also*,
Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Ex-
hibits 1-20), pages 285-286 — "Q. Do you know who at SDJ saw this e-mail? A. Me. . . Q. What's
did you do with this — this e-mail from Costco? A. Deleted. Q. Why? A. Not interested."

[82] Costco0000810–Costco0000813.

[83] Costco0000835–Costco0000841.

[84] Costco0000867.

tandem offer in clubs. . . ;"[85]

- September 15, 2021: from Mr. Wachsberg to Ms. Bubitz states, "The Brand retails for between $45 to $59 per single 8.1 oz jar, making our offer an effective 2 for 1 value based on better than brand performance and identical packaging impression;"[86]

- November 15, 2021: from Ms. Bubitz to Mr. Wachsberg states, "I am just concerned that the White Lid with the Yellow bottom is too close to the original and could cause some issues for both of us. . . ;"[87]

- December 10, 2021: from Ms. Bubitz to Mr. Wachsberg states, "We would like to move forward with this combination [a yellow lid and white jar];"[88] and

- December 13, 2021: from Ms. Bubitz to a large number of Costco personnel states, "We have worked with Apollo. . . to create a dupe of the Brazilian Bum Bum Cream. We will be doing the Nutrius Brazilian Body Butter Cream 2 6oz. Packs."[89]

**34.** A Costco order for 346,944 units (a unit being two 6 oz. jars of Brazilian Body Butter Cream) was signed on March 1, 2022, with a delivery date of May 1, 2022;[90] and a subsequent order for 415,200 units (approximately 20% greater than the first order) was signed August 3, 2022, with a delivery date of April 21, 2023.[91]

## F   Overview of Monetary Relief

**35.** Sol de Janeiro alleges that Counterclaim-Defendants have infringed the Trade Dress and Trademarks under the Lanham Act and New York common law by

---

[85] Costco0000870.
[86] Costco0000884–Costco0000886.
[87] Costco0000987–Costco0000996.
[88] Costco0001251–Costco0001264.
[89] Costco0001296.
[90] Costco0001521.
[91] Costco0002303.

advertising and selling the Accused Product.[92]  I understand that the Lanham Act provides that a prevailing plaintiff may, "subject to the principles of equity...recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."[93]  Further, "[i]n assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."[94]

**36.** For the purposes of this report, I have been asked to calculate forms of monetary relief that may be available to Sol de Janeiro, based on my review of documents that have been produced to me, assuming that liability will be found against Counterclaim-Defendants.

# V   COUNTERCLAIM-DEFENDANTS' PROFITS

**37.** I understand that the Lanham Act allows for the recovery of the profit earned by a defendant related to the infringement of a trademark or other violations.[95] Further, I understand that the Lanham Act requires that the plaintiff be responsible for establishing revenue, and that the defendant must establish any and all costs and deductions.[96]

**38.** I understand that in the Second Circuit, the disgorgement of a defendant's (or in this matter, counterclaim-defendants') profits may be awarded under the rationale of unjust enrichment, as a means of compensating the plaintiff for its lost sales, or to deter future infringement.[97]

---

[92] Answer to Second Amended Complaint and Amended Counterclaims of Defendants, August 24, 2023, paragraph 163.

[93] 15 U.S.C. §1117(a).  I do not offer opinions in this report regarding the costs of the action.

[94] 15 U.S.C. §1117(a).

[95] 15 U.S.C. §1117(a).

[96] 15 U.S.C. §1117(a).

[97] *See, for example, Burndy Corp. v. Teledyne Industries, Inc.*, 748 F.2d 767, 772 [2d Cir. 1984]. "The rule in this circuit has been that an accounting for profits is normally available only if the 'defendant is unjustly enriched, if the plaintiff sustained damages from the infringement, or if the accounting is necessary to deter a willful infringer from doing so again'." (citing *Burndy Corp. v. Teledyne Industries, Inc.*, 748 F.2d 767, 772 [2d Cir. 1984]).

Highly Confidential — Attorneys' Eyes Only

## A    Apollo's Accused Product Revenue

**39.**  As discussed previously, Sol de Janeiro alleges that Apollo's sales of the Accused Product infringe the Trade Dress and Trademarks.  In order to quantify the revenue earned by Apollo from selling the Accused Product, I reviewed Apollo's financial data produced in this matter.

**40.**  As shown in Tab 3, Apollo's financial data indicate that it realized U.S. net sales of $14.43 million from selling the Accused Product from June 2022 through July 2023.[98]

## B    Apollo's Accused Product COGS, Certain Expenses & Profit

**41.**  In the previous section, I compiled Apollo's U.S. revenue from sales of the Accused Product.  As noted previously, I understand that under the Lanham Act, it is a defendant's burden to demonstrate its costs when calculating the profits for products accused of infringement.  However, to be conservative, I have also considered information in the record of Apollo's cost of goods sold ("COGS") and certain other expenses for the Accused Product.

**42.**  As shown in Tab 3, Apollo's financial data indicate its COGS associated with the Accused Product was $7.69 million, and its advertising (*i.e.*, Apollo's cost of placing advertisements in the *Costco Connection* magazine) and Temporary Price Discount (*i.e.*, the amount Costco charges Apollo to offset Costco price reductions) expenses associated with the Accused Product were $0.67 million; therefore, after deducting these expenses, it realized profits of $6.06 million from selling the Accused

---

[98] This total amount includes Apollo's U.S. net sales provided by Apollo0003215 ($13.85 million), as well as Apollo's sales to Costco and PriceSmart that were made in or passed through the U.S., but were ultimately sold outside the U.S. ($0.58 million) (Deposition of Luai Bashori (Apollo CFO), September 13, 2023 (Exhibits 56-65), pages 103-104, and 110; and Tab 3).  The net sales that were ultimately sold outside the U.S. were quantified by the difference in the corresponding data between Apollo0001346 and Apollo0003215, and then adjusting using the net-to-gross sales ratio based on the data in Apollo0003215.

Product from June 2022 through July 2023 in the U.S. (= $14.43 million − $7.69 million − $0.67 million).[99]

## C    Costco's Accused Product Revenue

**43.** As discussed previously, Sol de Janeiro alleges that Costco's sales of the Accused Product infringe the Trade Dress and Trademarks. In order to quantify the revenue earned by Costco from selling the Accused Product, I reviewed Costco's financial data produced in this matter.

**44.** As shown in Tab 4, Costco's financial data indicate that it realized U.S. net sales of $13.05 million from selling the Accused Product (covering the date range from January 1, 2022 through August 6, 2023). Costco's stated per-unit selling price is $19.99 (in-store) and $24.99 (costco.com).[100]

## D    Costco's Accused Product COGS & Gross Profit

**45.** In the previous section, I compiled Costco's U.S. revenue from sales of the Accused Product. As noted previously, I understand that under the Lanham Act, it is a defendant's burden to demonstrate its costs when calculating the profits for products accused of infringement. However, to be conservative, I have also considered information in the record regarding Costco's COGS for the Accused Product.

**46.** As shown in Tab 4, Costco's financial data indicate that its COGS associated with the Accused Product was $11.48 million (= 669,243 units sold × $17.15 per unit); therefore, it realized gross profits of $1.57 million from selling the Accused Product (covering the date range January 1, 2022 through August 6, 2023) in the U.S. (= $13.05 million − $11.48 million).[101]

---

[99] I understand from Counsel that, if either the Trade Dress or Trademarks is found to have been infringed, the monetary relief would be equivalent because each serves as a source identifier.

[100] Costco0003943. I understand the costco.com price in higher due to the added shipping cost (Deposition of Lindsay Bubitz (Costco Buyer), August 25, 2023 (Exhibits 1-39), page 126).

[101] I understand from Counsel that, if either the Trade Dress or Trademarks is found to have been infringed, the monetary relief would be equivalent because each serves as a source identifier.

Highly Confidential — Attorneys' Eyes Only

# VI  HARM TO PLAINTIFF:
# REASONABLE ROYALTY DAMAGES

**47.** Although I have been asked to assume that Sol de Janeiro will prove that it has been harmed, I understand there is evidence that Counterclaim-Defendants' alleged infringement has caused harm to Sol de Janeiro. For example:

- I understand there have been incidents of actual confusion and/or misattribution regarding the Accused Product and Brazilian Bum Bum Cream, which I understand Sol de Janeiro claims as evidence of harm to Sol de Janeiro;[102]

- Dr. Thomaï Serdari's opinions, including:

  - "If consumers mistakenly believe that Apollo's Brazilian Body Butter Cream product sold at Costco is Sol de Janeiro's Brazilian Bum Bum Cream or is otherwise authorized by Sol de Janeiro, then Sol de Janeiro's marketplace position as a premium skin care brand would be severely damaged and that damage will be very difficult to correct;"[103]

  - "As soon as consumers believe that Sol de Janeiro's product is in Costco, they will conclude that Sol de Janeiro has reached its final stages and that the prestige that Sol de Janeiro carefully developed is no more;"[104]

  - Brazilian Bum Bum Cream's positioning as a premium brand would be harmed because Costco "primarily sells mass-market brands" and in the mass market, brands "compete on price," which is inconsistent with the premium positioning of Brazilian Bum Bum Cream at Sephora;[105] and

  - Sol de Janeiro would be harmed "whether consumers are confused by both the similarities in trade dress and trademarks or by one or the other. If

---

[102] *See, for example*, SDJ 0001986–SDJ 0001995 (Customers confusing Bum Bum Cream with the Costco product).

[103] Expert Report of Thomaï Serdari, Ph.D., MBA, October 16, 2023, paragraph 6.

[104] Expert Report of Thomaï Serdari, Ph.D., MBA, October 16, 2023, paragraph 47.

[105] Expert Report of Thomaï Serdari, Ph.D., MBA, October 16, 2023, paragraphs 38-40.

Highly Confidential — Attorneys' Eyes Only                                                          25

consumers mistakenly believe that the Brazilian Body Butter Cream is a Sol de Janeiro product or is the Brazilian Bum Bum Cream itself, it will fundamentally alter Sol de Janeiro's positioning as a premium brand."[106]

- Sol de Janeiro's Chief Executive Officer, Ms. Yang, testified that:

  – Counterclaim-Defendants' infringement of the Trade Dress and Trademarks has "done big damage to our brand;"[107]

  – "[T]he most valuable thing to our company is the brand, and the brand is clearly damaged by consumers' confusion, and we cannot guarantee their experience because [the Accused Product] wasn't made by us;"[108]

  – "I think consumers, they wonder about whether Sol de Janeiro has a side business. I mean, it's a trust issue;"[109]

  – "[T]here are many ways that [the Accused Product] has really damaged our brand. Number 1, that there's a confusion... who is making this product? And so consumers don't really understand and [don't] know with certainty whether [the Accused Product was] produced by Sol de Janeiro or like associated like sister company... we can't control their experience at all. And so that is a huge damage to the trust with our customers... third, the down market... there's a reason why I did not sell to Costco, why I didn't even reply to Costco... a down market which really... degrades the brand positioning, which I've worked so hard to build and to — and to maintain for the long-term;"[110] and

---

[106] Expert Report of Thomaï Serdari, Ph.D., MBA, October 16, 2023, paragraph 48.
[107] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), page 308.
[108] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), page 308.
[109] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), page 310.
[110] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), page 316.

Highly Confidential — Attorneys' Eyes Only

– "[F]or me to find a product that... intentionally caused to create confusion... that is a real... damage to the trust that I built with the consumers."[111]

• Ms. Menkis, a brand and product consultant for Sol de Janeiro,[112] described the Accused Product's damage to Sol de Janeiro as, "if the consumer perceives us to be doing a discounted version or a Costco version or however you want to call it, if the consumer perceives us to be engaging in that behavior, it may make the brand seem down marketed."[113] The retail price of the Accused Product is substantially less than that of Brazilian Bum Bum Cream. In general terms, the retail price of Brazilian Bum Bum Cream (for one 240 mL or 8 oz. container) is approximately $48 (or $0.20 per mL),[114] and the Costco in-store retail price of Brazilian Body Butter Cream (for two 177 mL or 6 oz. containers) is $19.99 (or $0.06 per mL) — over a three times per mL or ounce price difference.[115]

**48.** Mr. Wachsberg testified that Costco sells products at a lower price point,[116] and that selling Brazilian Bum Bum Cream at both Sephora and Costco would be in "direct conflict."[117]

**49.** Sol de Janeiro alleges that due to the Counterclaim-Defendants' infringement, relevant consumers believed that either the Accused Product was a Sol de Janeiro product or that Sol de Janeiro had launched a secondary product line.[118] For

---

[111] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), page 319.

[112] Deposition of Haley Menkis (Brand & Product Consultant for Sol de Janeiro), September 8, 2023 (Exhibits 1-21), page 62.

[113] Deposition of Haley Menkis (Brand & Product Consultant for Sol de Janeiro), September 8, 2023 (Exhibits 1-21), page 268.

[114] *See, for example*, <www.soldejaneiro.com/products/brazilian-bum-bum-cream>.

[115] *See*, Costco0003943.

[116] Deposition of Charlie Wachsberg (Apollo Co-CEO), September 15, 2023 (Exhibits 4-9, 16-17, 19-20, 22-23, 28, 30, 32, 39, 44, 47-49, 52, and 66-70), pages 101-102.

[117] Deposition of Charlie Wachsberg (Apollo Co-CEO), September 15, 2023 (Exhibits 4-9, 16-17, 19-20, 22-23, 28, 30, 32, 39, 44, 47-49, 52, and 66-70), pages 103-104.

[118] *See, for example*, SDJ 0001986–SDJ 0001995 (Customers confusing Bum Bum Cream with the Costco product); and Answer to Second Amended Complaint and Amended Counterclaims of Defendants, August 24, 2023, paragraphs 162, and 170-173.

example, when asked about why she has a problem with Apollo pricing the Accused Product so low relative to Brazilian Bum Bum Cream, Ms. Yang replied, "[w]ell, first, the intention was to leverage the hype around our product and the brand awareness we have. And so it's very, very clear what their intention was [—] to bring a product that's so similar that could cause confusion to consumers and say, oh, I'll buy this."[119]

**50.** I understand that one potential form of monetary relief that may be available to Sol de Janeiro to compensate it, at least in part, for the harm that it has suffered is reasonable royalty damages. In case the fact-finder determines that Sol de Janeiro has been harmed due to the alleged actions of Counterclaim-Defendants and determines that a reasonable royalty is an appropriate proxy for the harm (or some portion of the harm) it has suffered, I provide an analysis of reasonable royalty damages in the following sections. In a hypothetical negotiation for a reasonable royalty, the parties would negotiate a royalty rate based on the bargaining positions of the parties, under the assumption that the Counterclaim-Defendants would not be able to sell the Accused Product without a license.

**51.** As discussed herein, there is publicly available information for trademark licensing in the personal care products industry (*i.e.*, Personal Care Products Toiletry Related) that provides a reliable basis for calculating reasonable royalty damages in this matter.

**52.** While I have been asked to assume that Sol de Janeiro will demonstrate that it has been harmed due to the actions of Counterclaim-Defendants, it is a recognized concept in intellectual property valuation and licensing that, all else equal, exclusive use and control of intellectual property is more valuable than non-exclusive use and control.[120]   Therefore, based on the above, even if Apollo was putting out

---

[119] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), pages 57-58.

[120] *See for example*, "Licensing, Royalty Rates, and Valuation," in: Gordon V. Smith and Russell L. Parr, VALUATION OF INTELLECTUAL PROPERTY AND INTANGIBLE ASSETS, Third Edition, John Wiley & Sons, Inc., 2000, page 365; Tim Heberden, "Intellectual Property Valuation and Royalty Determination," Wolters Kluwer Law & Business, 2011, page 11; Russ O'Haver and Brian Finnegan, "Estimating the Effects of Exclusivity and Geographic Market Characteristics

Highly Confidential — Attorneys' Eyes Only

the product at issue under a license from Sol de Janeiro — even a license that Sol de Janeiro willingly entered into — Sol de Janeiro would have experienced some loss of value because of the loss of control of its brand and related assets.[121] If it is found that infringement has occurred here, then the loss of value to the brand would likely exceed the reasonable royalty because Apollo would be putting out a product that consumers mistake for Sol de Janeiro's when Sol de Janeiro did not choose to license any rights to Apollo. Damages resulting from such conduct would likely not be less than the reasonable royalty that would have been in place following a (hypothetical) negotiation between the parties.

**53.** Consistent with the above, I understand that in Lanham Act matters it has been determined that a trademark owner's loss of the ability to control its reputation is a legally cognizable form of injury and that jury verdicts awarding royalty damages as a means to compensate a plaintiff for the harm to its brand resulting from a defendant's infringement have been upheld even in the absence of prior licensing agreements between the parties, at least where evidence provided a sufficiently reliable basis from which a fact-finder could calculate such damages.[122]

**54.** Based on the above, as well as described more fully below, I understand that a reasonable royalty is a potential form of damages in this case for the fact-finder to consider. As a result, I have been asked to quantify reasonable royalty damages.

---

on Royalty Rates: Some Preliminary Results," Ernst & Young LLP, 1993, page 1; Stuart Whitwell, "Brand Valuation News: The power of brands – understanding royalty rates," Intangible Business, April 2013; and Thomas R. Varner, "An Economic Perspective on Patent Licensing Structure and Provisions," *les Nouvelles*, March 2012, page 34.

[121] *See*, Expert Report of Thomaï Serdari, Ph.D., MBA, October 16, 2023, paragraph 47 — "Sales of Brazilian Bum Bum Cream at Costco or other mass-market retailers would accelerate the death of the premium positioning of the brand."

[122] *See, for example*, *adidas America, Inc. and adidas-Solomon AG v. Payless Shoesource, Inc.*, 3:01-cv-01655-KI, Dkt. 860 (May 1, 2008); and *adidas America, Inc. and adidas-Solomon AG v. Payless Shoesource, Inc.*, 3:01-cv-01655-KI, Dkt. 942 (September 12, 2008).

# A    Reasonable Royalty: Hypothetical Negotiation

**55.** To determine a reasonable royalty, courts often consider a "hypothetical negotiation" between a willing licensor and a willing licensee to guide the analysis.[123] The hypothetical negotiation is conducted under the premise that the parties to the negotiation would have known that the relevant intellectual property (here the Trade Dress and Trademarks) was valid and would be infringed by the defendant (here Apollo and Costco) unless it obtained a license to use the intellectual property from the plaintiff (here Sol de Janeiro). The hypothetical negotiation in this matter is used to determine a reasonable royalty as a surrogate measure for some portion of the damages suffered by Sol de Janeiro due to the allegedly infringing actions of Apollo and its customers. While the hypothetical negotiation is assumed to take place at the time infringement began (*i.e.*, mid 2022), I understand that courts often consider data subsequent to the date of first infringement in determining reasonable royalty damages.

**56.** I understand that the Trade Dress and Trademarks, both together and separately, identify Sol de Janeiro as an exclusive source; therefore, a license to either would provide the licensee with the goodwill associated with the Brazilian Bum Bum Cream product and brand.[124]

**57.** A royalty calculation is typically comprised of two components: a royalty rate and a royalty base. My trade dress and trademark licensing experience, as

---

[123] *Georgia-Pacific v. United States Plywood Corporation*, 318 F.Supp. 1116 (S.D.N.Y. 1970).

[124] Interview of Haley Menkis, Brand & Product Consultant for Sol de Janeiro.

Also, for example, in addition to the millions of dollars expended by Sol de Janeiro in advertising and promoting Brazilian Bum Bum Cream, Ms. Yang testified that, the "overall shape [of the Brazilian Bum Bum Cream jar]...was very, very important to the brand;" "[w]e had an entire manifesto we wrote about the brand;" "[e]verything that we did had to have curves. The round bottom of this jar was an absolutely critical decision...celebrating everyone's curves;" selecting the Brazilian Bum Bum Cream name "was a critical decision for our company, and so it was a combination of the name, Brazilian Bum Bum cream, and the shape of the jar, and then the yellow color;" the "shape of the jar really amplifies the brand's personality;" "[w]e have a unique name which we worked very hard to come up with, and we said, let's shout it out. Why be subtle? Again, let's be bold;" and the "shape [of the jar] has also become a very, very clear indication of our cream" (Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), pages 103-104, 122-123, 125, 165, 173, and 181).

well as my personal care industry research, indicate that royalty rates are commonly expressed as a percentage of sales or revenue. The royalty base is the amount to which the royalty rate is applied, typically net sales or revenue of the product at issue.

**58.** To determine the results of a hypothetical negotiation that would grant Apollo the non-exclusive right to use the Trade Dress and Trademarks in selling the Accused Product (which would then carry on through its customers' retail sales), I have considered several factors that may provide relevant information regarding an appropriate royalty rate in intellectual property infringement cases. These factors include: evidence of royalty rates paid by others in similar contexts; the benefits and costs to the trade dress/trademark owner of licensing; the willingness of the trade dress/trademark owner to enter into a license agreement; the benefits to the licensee associated with the use of the trade dress/trademark; and other relevant factors specific to the hypothetical negotiation, such as the parties' respective strategic and bargaining positions.[125] These factors are consistent with those considered by courts in the context of intellectual property hypothetical negotiations,[126] are consistent with licensing practice outside of litigation, and represent a reasonable and reliable method for calculating royalty damages.

**59.** I have assumed that reasonable royalty damages begin at the earliest sales date according to the documents produced by Apollo. As such, I have assumed that a hypothetical negotiation for the Trade Dress and Trademarks would have taken place just prior to this date and would have only included rights to use the Trade Dress and Trademarks on the Accused Product for Apollo and its customer Costco. Further, I calculate royalties through the latest date for which Apollo has produced sales data for the Accused Product.[127]

---

[125] The Court in *Georgia-Pacific v. United States Plywood Corporation*, 318 F.Supp. 1116 (S.D.N.Y. 1970) identified a set of fifteen factors for patent infringement matters. In trade dress and trademark cases, experts typically analyze and utilize the factors or concepts that are relevant to the specific situation.

[126] *Georgia-Pacific v. United States Plywood Corporation*, 318 F.Supp. 1116 (S.D.N.Y. 1970).

[127] I reserve the right to update my calculations based on other damages periods or sales data that may be determined in the future.

## B  Royalty Rate

**60.**  I considered a number of factors that provide relevant information regarding an appropriate royalty rate in intellectual property infringement cases. These factors include: evidence of royalty rates paid by the parties or by others in similar contexts, the benefits and costs to the intellectual property owner of licensing, the willingness of the intellectual property owner to enter into a license agreement, the benefits to the licensee associated with the use of the intellectual property, and other relevant factors specific to the hypothetical negotiation. These are also the economic factors that trade dress and trademark owners and licensees consider when negotiating license agreements outside of litigation.

**61.**  As discussed previously, Sol de Janeiro believes that the Trade Dress and Trademarks have become well-known nationwide in the beauty industry and among consumers — and thus have significant commercial value — because of the millions of dollars Sol de Janeiro has expended advertising, marketing, and promoting Brazilian Bum Bum Cream; the media coverage of Brazilian Bum Bum Cream; the over $100 million in Brazilian Bum Bum Cream sales; and the "buzz" associated with Brazilian Bum Bum Cream. Ms. Yang further stated that Sol de Janeiro's brand, which would include the Trade Dress and Trademarks from its best-selling product, is its most valuable asset.[128] Therefore, the brand would be the most valuable asset comprising the $450 million purchase price of Sol de Janeiro.[129] Further, the previously discussed email communications between Costco and Apollo discussing Apollo's development of the Accused Product, with references to Brazilian Bum Bum Cream, indicate the perceived importance of the Trade Dress and Trademarks.

**62.**  There is evidence in this case of trademark licensing by companies within the personal care industry. Based on publicly available license agreements identified

---

[128] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), page 49.

[129] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), page 95.

from the RoyaltySource database, the low and high royalty rate range is 4% to 20%, and the interquartile royalty rate range is approximately 5% to 8%.[130] Based on this interquartile royalty rate range starting point, I then opine on the reasonable royalty rate considering the specific facts and circumstances in this matter.

**63.** Further, my analysis of other relevant considerations to the hypothetical negotiation is described below. The factors and issues considered herein are based on the concepts set forth in the *Georgia-Pacific* case, which is commonly used by experts in intellectual property litigation. The factors considered and described herein are those that parties engaged in trademark or trade dress license negotiations outside of litigation consider. As such, the analysis of a hypothetical negotiation considered in this report represents a reliable basis for calculating reasonable royalty damages.

### i   Personal Care Products (Toiletry Related) License Agreements

**64.** I consulted the RoyaltySource Intellectual Property database (a database of publicly available information regarding intellectual property license agreements) and requested searches for trade dress and trademark license agreements for personal care products — the same industry that would include the Accused Product. This database is commonly used by intellectual property valuation and licensing professionals. Based on the RoyaltySource database, its relevant primary categorization term is "Personal Care Products (Toiletry Related)." After reviewing the initial 100+ search results, I selected the licenses that I believed to be most informative in this matter. These licenses were selected because they were trademark-related, were not between related parties, occurred after 2000, were not celebrity-related, and were for personal care products. A summary of the personal care product license agreements selected and used in my royalty rate analysis is presented in Tab 6. In summary, the royalty rates specified in these agreements generally were: low of 4%, high of 20%, median

---

[130] *See*, Tab 6. My interquartile range calculation excludes the Gucci-P&G royalty rates (9% to 9.5%, which are above the upper end of the interquartile range) because I do not have this license agreement and, therefore, do not give the data particular weight.

of 7%, and an interquartile range of 5% to 8%. These royalty rates are applied to a sales base, which varies by agreement. Based on the analyzed agreements, the sales bases are generally defined as gross sales, net sales,[131] or wholesale sales.[132] My selected royalty base — net wholesale sales — would be lower than a corresponding base defined as retail net or gross sales, or wholesale gross sales.

**65.** In addition to payments based on a royalty rate, some of these license agreements require the licensee to pay the licensor additional forms of compensation (*e.g.*, upfront fees, minimum royalties, and advertising fees/allowances).[133]

**66.** Nearly all of the agreements are categorized as exclusive.[134] Based on my experience, this is common in trademark licensing for consumer products, where a licensor typically provides an exclusive license to a licensee for a specific product(s), channel(s), and/or territory(ies).

**67.** The agreements presented in Tab 6 — unlike the hypothetical negotiation in this matter — do not appear to be associated with companies in competition by selling an authentic and "copycat" product (and thus are conservative for establishing a royalty rate in this case), as summarized below:[135]

- Aerin (licensor: a clothing and beauty products brand) and Esteé Lauder (licensee: a leading prestige beauty company);[136]

- Guess? (licensor: designer and manufacturer of clothing and fashion accessories) and Parlux Fragrances (licensee: manufacturer and distributor of prestige designer, lifestyle and celebrity fragrances);[137]

- Hand Perfection and Ellen Sirot (licensor: model who developed an anti-aging

---

[131] With one agreement (Guess?–Parlux) stating that net sales is based on the manufacturer's suggested retail price.

[132] *See*, Tab 6.

[133] *See*, Tab 6.

[134] *See*, Tab 6.

[135] Unless noted otherwise, the licensor descriptions are from Tab 6.

[136] <www.elcompanies.com/en>.

[137] <www.linkedin.com/company/parlux-fragrances>.

and skin care line) and CCA Industries (licensee: operates in an industry segment that may be generally described as fast-moving consumer goods, selling numerous products in multiple health-and-beauty aids, over the counter drug and remedies and cosmeceutical categories);[138]

- I|M1 (licensor: men's lifestyle brand focused on millennials) and NuGene (licensee: engages in the research, development, sales, and marketing of cosmeceutical skincare products);[139]

- J Choo (licensor: shoe and handbag designer) and Inter Parfums (licensee: produces and distributes fragrance and fragrance-related products under license agreements with brand owners);[140]

- Nine West (licensor: textile products and apparel manufacturer) and Inter Parfums (licensee);

- QS Holdings (licensor: sporting company and manufacturer of surfwear and other boardsport-related equipment) and Inter Parfums (licensee);[141]

- Retail Brand Alliance d/b/a/ Brooks Brothers (licensor: men's clothier) and Inter Parfums (licensee); and

- Gucci (licensor: luxury brand of fashion and leather goods) and Procter & Gamble (licensee: large consumer goods company providing a wide range of personal care and hygiene products).

**68.** Further — unlike the agreement that would be reached in the hypothetical negotiation — the agreements presented in Tab 6 (with two possible exceptions) all explicitly contain quality, approval, or similar provisions.[142]

---

[138] CCA Industries, Inc., Form 10-K, for the fiscal year ended November 30, 2018, page 2.
[139] <www.barrons.com/market-data/stocks/nugn>.
[140] <www.interparfumsinc.com/about-us>.
[141] <www.interparfumsinc.com/about-us>.
[142] For example:

**69.** While I understand that the license agreements that are publicly available via RoyaltySource typically include the licensed rights for trademarks, these are appropriate to consider in this case because (1) trade dress, like a trademark, is by definition an indicator of the source of goods — and I understand that Sol de Janeiro believes in this case that its Trade Dress serves as a source identifier,[143] and (2) this case involves alleged Lanham Act violations involving the infringement of both the Trade Dress and Trademarks.

**70.** As a reasonableness check regarding the royalty rates observed from the

- Sections 5 and 6 (Approvals; and Design and Manufacturing) (License Agreement among Aerin LLC, Aerin Lauder Zinterhofer and Estee Lauder Inc., April 6, 2011);

- Sections 5 and 7 (Quality Control and Approvals; and Advertising) (Trademark License Agreement among Guess?, Inc., Guess? IP Holder L.P. and Parlux Fragrances, November 1, 2003);

- Sections 7-10 (Quality Assurance, Display of Merchandise, Labeling, and Promotional Materials) (License Agreement between I|M1, LLC and NuGene International, Inc., March 31, 2017);

- Sections 4-5 (Product and Quality Control; and Marketing and Launch Plans, Advertising, Marketing and Sales Promotion) (License Agreement between J Choo Limited and Inter Parfums SA, September 29, 2009);

- Articles 2-3 (Approvals; and Manufacture, Distribution and Delivery of Licensed Articles) (License Agreement between Nine West Development Corporations and Inter Parfums USA, LLC, July 21, 2010);

- Articles 4 and 7 (Creation, Manufacturing, Distribution; and Advertising, Launch of New Profits, "Road Map") (Trademark License Agreement between QS Holdings SARL and Inter-Parfums, March 23, 2006); and

- Sections 6-7 and Exhibit G (Manufacture of Licensed Products and Quality Control; Advertising; and Licensor's Guidelines for Domestic Vendors) (Brooks Brothers Manufacturing and License Agreement between Retail Brand Alliance, Inc., d/b/a Brooks Brothers and Inter Parfums USA, LLC, effective 2008).

One exception is Hand Perfection and Ellen Sirot (licensor), where the provided information does not contain the details of the agreement, but instead only a summary. The second exception is Gucci (licensor), where the data comes from an industry article and thus does not provide details of the agreement.

[143] For example, "[s]o when a person chooses Bum Bum — Brazilian Bum Bum cream, she is choosing to endorse what the brand stands for. She has trust in the brand. She has trust in the quality of the product, and so it's all the experiences that a product offers the customer that the brand stands for. So the packaging, the design is part of that [] experience;" the "shape [of the jar] has also become a very, very clear indication of our cream;" and a Boston Consulting Group study performed prior to L'Occitane's acquisition of Sol de Janeiro states that Sol de Janeiro is recognized for its iconic packaging (Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), pages 144, 181, and 255).

RoyaltySource license agreements, I reviewed *Licensing Royalty Rates* (2018 Edition by Gregory J. Battersby and Charles W. Grimes), which provides a "working range" of royalty rates based on a survey of industry experts.[144] This source, which is often referenced by licensing experts and is respected within the industry, provides a range of royalty rates for many International Class 3 (Cosmetics and Cleaning Preparation) product categories, including body cream, lotions, and skin lotion that are similar to the product at issue in this matter.[145] The royalty rates in this source are provided for different categories (*e.g.*, Celebrity, Collegiate, Corporate, Fashion, Sports). For the Corporate category, the indicated range of royalties for body cream, lotions, and skin lotion is 5% to 8%.[146] While the information from this source did not provide probative information regarding a royalty rate, it did indicate results that were similar to those from the RoyaltySource license agreements for personal care products.

### ii   Sol de Janeiro's Benefits & Costs of Licensing the Trade Dress and Trademarks

**71.**   In the context of a hypothetical negotiation, Sol de Janeiro would consider both the benefits and costs of granting a license to Apollo for the Trade Dress and Trademarks.

**72.**   As previously discussed, Sol de Janeiro's Brazilian Bum Bum Cream brand is well known and provides material value to Sol de Janeiro because I understand that it has been actively managed since its initial launch, has gained recognition through numerous publications, has been featured and widely recognized in rankings and lists of body care products, and has been reviewed by influencers and video bloggers.

---

[144] Gregory J. Battersby, Charles W. Grimes, "Licensing Royalty Rates," Wolters Kluwer Legal & Regulatory U.S., 2018.

[145] Gregory J. Battersby, Charles W. Grimes, "Licensing Royalty Rates," Wolters Kluwer Legal & Regulatory U.S., 2018, pages 79-80.

[146] Gregory J. Battersby, Charles W. Grimes, "Licensing Royalty Rates," Wolters Kluwer Legal & Regulatory U.S., 2018, pages 79-80. "We fully expect that particularly hot properties may justify rates higher than those listed" (Gregory J. Battersby, Charles W. Grimes, "Licensing Royalty Rates," Wolters Kluwer Legal & Regulatory U.S., 2018, page ix).

Further, millions of dollars have been expended promoting and advertising Brazilian Bum Bum Cream, which has achieved cumulative revenues of over $100 million. For the Brazilian Bum Bum Cream brand (including the Trade Dress and Trademarks), Sol de Janeiro's continued promotion/control of the brand's image and protection of the brand from infringement by others are consistent with maintaining and increasing the commercial value of the brand.

**73.** If Sol de Janeiro was to license the Trade Dress and Trademarks to Apollo, Sol de Janeiro would benefit from the resulting royalty income it would receive. However, this royalty income would come at a "cost" to Sol de Janeiro. I understand, as discussed herein and below, that Professor Serdari and Sol de Janeiro believe there would be significant harm to Sol de Janeiro if it was to license the Trade Dress and Trademarks to Apollo. For example:

- Once Brazilian Bum Bum Cream was sold in Costco, consumers would conclude that Sol de Janeiro had reached its final stages as a prestige brand[147] and had "come to Costco to surrender its premium status;"[148]

- Brazilian Bum Bum Cream being sold as Costco would dramatically change consumers' views of it because "the product would appear in a place alongside mass brands, where premium brands do not belong...The brand's intangible value would evaporate, and its [premium] price would no longer be justified;"[149]

- The licensed product would cause consumer confusion[150] and be perceived as Sol de Janeiro down marketed.[151] Ms. Yang testified that Counterclaim-Defendants' infringement of the Trade Dress and Trademarks has "done big damage to our

---

[147] Expert Report of Thomaï Serdari, Ph.D., MBA, October 16, 2023, paragraph 47.

[148] Expert Report of Thomaï Serdari, Ph.D., MBA, October 16, 2023, paragraph 45.

[149] Expert Report of Thomaï Serdari, Ph.D., MBA, October 16, 2023, paragraph 44.

[150] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), pages 308 and 310.

[151] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), page 317.

brand,"[152] and thus has damaged Sol de Janeiro's most valuable asset; and

- The licensed product being "a discounted version or a Costco version" of Brazilian Bum Bum Cream would make the Brazilian Bum Bum Cream brand appear down marketed.[153]

**74.** While a hypothetical negotiation with Apollo regarding the Accused Product would be for a royalty-bearing license agreement, in considering the royalty rate, Sol de Janeiro would assess the detrimental economic impacts on its business from: (1) an agreement that provides a competitor a license to sell the same product type (body cream) (*e.g.*, potential price erosion and lost unit sales), (2) an agreement in which the licensed product is sold at a substantially lower price, (3) a lack of control regarding the licensed product, and (4) the licensed product's divergence from Sol de Janeiro's cultivated brand image.[154] These issues would cause Sol de Janeiro to require — all else being equal — a royalty rate higher than those specified in industry license agreements that do not involve competitors or that alter a product's premium positioning.

---

[152] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), page 308.

[153] Deposition of Haley Menkis (Brand & Product Consultant for Sol de Janeiro), September 8, 2023 (Exhibits 1-21), page 268.

[154] *For example*, when discussing Brazilian Bum Bum Cream's price positioning and why people pay more for certain similar products (*i.e.*, would pay more for Brazilian Bum Bum Cream than for the Accused Product), Ms. Yang stated, "[b]ecause No. 1, there's a brand and there's a trust, and there's a lot of work that went into creating that product...So [the brand is] one of the most important factors of [] purchase decisions" (Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), pages 55-56).

Further, Ms. Menkis testified that "if the consumer perceives [Sol de Janeiro] to be doing a discounted version or a Costco version...it may make the brand seem down marketed" (Deposition of Haley Menkis (Brand & Product Consultant for Sol de Janeiro), September 8, 2023 (Exhibits 1-21), page 268். In fact, Mr. Wachsberg testified that selling Brazilian Bum Bum Cream at both Sephora and Costco would be in "direct conflict" (Deposition of Charlie Wachsberg (Apollo Co-CEO), September 15, 2023 (Exhibits 4-9, 16-17, 19-20, 22-23, 28, 30, 32, 39, 44, 47-49, 52, and 66-70), pages 103-104).

Highly Confidential — Attorneys' Eyes Only

### iii  Sol de Janeiro's Willingness to License the Trade Dress and Trade-marks

**75.** The evidence indicates that, if presented with the opportunity in or around 2022, Sol de Janeiro would not have considered licensing the Trade Dress or Trademarks to either Apollo or Costco (*i.e.*, Apollo's primary customer for the Accused Product). For example, on November 27, 2020, Costco's Ms. Bubitz sent Sol de Janeiro a message through its website form stating, "I was wondering if we could set up a meeting to discuss possibly carrying your product! I am a huge fan of the Bum Bum Cream and Body Wash. Please let us know if we can set up a meeting."[155] I understand that there was no response from Sol de Janeiro.

**76.** Ms. Yang testified that she would not be interested in selling Sol de Janeiro products (including Brazilian Bum Bum Cream), which she considers a premium beauty brand, at Costco because:[156]

> For premium beauty, the only reason any premium beauty brand sells at Costco is to generate cash or handle their excess inventory, manage their inventory level. It is not a channel a retailer where you build brand, where you invest for brand awareness. It's not a strategic retailer. So for some companies, they might need that, they might need [] cash, but for us, we're still a very young brand and we'll continue to be much more strategic about what we do, so it's about the positioning of the brand. It really cheapens the brand. The people find your product at Costco, they immediately know — first of all, it's discounted, and second of all, they think, oh, it's a product you can find anywhere. . .[157]

**77.** Professor Serdari described premium brands as making "a promise of value

---

[155] SDJ 0001820–SDJ 0001821.

[156] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), pages 51, and 285-286.

[157] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), page 50.

that is commensurate with the quality of the experience they create for the consumer... premium brands aim to provide their consumers with some notion of value that is based not only on an aspirational message or idea but also from the relationship between quality and price... Like luxury brands, however, premium brands typically sell a value that may be more aspirational than practical. A premium or luxury positioning indicates that a brand presents more than just functional value for the consumer."[158] Ms. Yang testified that "Apollo copied our product, but did not price it higher. They priced it lower. That's because that goes with the channel... it's not a premium channel. It's not a premium product."[159]

**78.** Ms. Menkis testified that no one from Sol de Janeiro responded to the Costco email because Sol de Janeiro was not interested because selling at Costco would be damaging to Sol de Janeiro's brand positioning, and it might be seen as "discounting and things aren't going well" for Sol de Janeiro.[160]

**79.** Ms. Yang further testified that Sol de Janeiro has never licensed the Trade Dress or Trademarks to a third party, and has never had licensing discussions with a third party regarding the Trade Dress or Trademarks,[161] which evidences Sol de Janeiro's desire to maintain its exclusive use of the Trade Dress and Trademarks.

**80.** However, in the hypothetical negotiation construct often used by damages experts, the parties assume that the intellectual property rights are valid and infringed, and the reasonable royalty rate is established at a level that the parties would agree to, even if they had expressed an interest in not licensing.[162]

---

[158] Expert Report of Thomaï Serdari, Ph.D., MBA, October 16, 2023, paragraph 22.

[159] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), page 51.

[160] Deposition of Haley Menkis (Brand & Product Consultant for Sol de Janeiro), September 8, 2023 (Exhibits 1-21), page 240.

[161] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), pages 300-301

[162] *See, e.g., Gucci Am., Inc. v. Guess?, Inc.*, 858 F.Supp.2d 250, 255–56 (S.D.N.Y. 2012); *On Site Energy Co. v. MTU Onsite Energy Corp.*, No. 10-CV-1671 JS WDW, 2012 WL 2952424, at *2 (E.D.N.Y. July 19, 2012); *Buffalo Wild Wings, Inc. v. Buffalo Wings & Rings*, Civil No. 09-1426 (JRT/SER) (September 29, 2011); *Choice Hotels International, Inc. v. Goldmark Hospitality, LLC, et al.*, Civil Action No. 3:12-CV-0548-D (February 19, 2014); *ITT Corp. v. Xylem Group, LLC*, 963 F.Supp.2d 1309 (2013); *A & H Sportswear Co., Inc. v. Victoria's Secret Stores, Inc.*,

### iv   Apollo's Benefits of Licensing the Trade Dress and Trademarks

**81.**  In the context of a hypothetical negotiation, Apollo would evaluate its benefits from using the Trade Dress and Trademarks. In general, the benefits would include allowing Apollo and its customers, such as Costco, to realize sales and profits from the Accused Product without infringing the Trade Dress and Trademarks, an association with Sol de Janeiro, and the goodwill of the Brazilian Bum Bum Cream brand and its Trade Dress and Trademarks.[163]  Under a hypothetical license, Apollo and its customers would be able to market and sell the Accused Product that they did, earning the same sales that they did, in the manner and channels that they did.

**82.**  Based on the previously discussed 2021 communications between Costco and Apollo, a reasonable inference is that Costco perceived that there would be economic benefits from leveraging the Brazilian Bum Bum Cream Trade Dress and Trademarks.[164]  That is, Apollo and its customers would benefit from the Brazilian Bum Bum Cream brand's goodwill created by Sol de Janeiro. Regarding the importance of the Trade Dress/Trademarks and brand, Ms. Yang testified, for example that:

- The "overall shape, so the fact that it's round at the bottom was very, very important to the brand, and then the overhang cap was a design element that represents more of like a curvaceous oversize more real women versus skinny models;"[165]

---

967 F.Supp. 1457 (1997); and *QS Wholesale, Inc. v. World Marketing, Inc.*, No. SA 12-CV-0451(RNBx) (May 9, 2013).

[163] As noted above, I have assumed that liability will be found against Counterclaim-Defendants. My understanding is that this would involve a determination that a likelihood of confusion exists involving the Accused Product and the Trade Dress and Trademarks.

[164] For example, email communications between Apollo and Costco stating: "given the specific name recognition associated with 'Brazilian Bum Bum Cream', I'm thinking you may wish to focus on this particular equity in commercializing [the Brazilian Body Butter Cream] opportunity for optimal awareness and success" (Costco0000835–Costco0000841), "[t]he [Brazilian Body Butter Cream] jars resemble the brand as well and these would be used to create the desired selling unit" (Costco0000870), Brazilian Body Butter Cream has "identical packaging impression" as Brazilian Bum Bum Cream (Costco0000884–Costco0000886), and Costco has "worked with Apollo…to create a dupe of the Brazilian Bum Bum Cream" (Costco0001296).

[165] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023

Highly Confidential — Attorneys' Eyes Only                                          42

- "...everything that we did had to have curves. The round bottom of this jar was an absolutely critical decision for the rest of the company's history...an integral part of who we are and celebrating everyone's curves;"[166]

- The Brazilian Bum Bum Cream name "was a critical decision for our company, and so it was a combination of the name, Brazilian Bum Bum cream, and the shape of the jar, and then the yellow color;"[167]

- The lid overhang was made bigger to "dramatize their generous and curvaceous nature of this product and our brand...We're not a slim, slender delicate brand. We're chunky. We're bold. So we wanted to have a substantial cap...;"[168]

- "So when a person chooses Bum Bum — Brazilian Bum Bum cream, she is choosing to endorse what the brand stands for. She has trust in the brand. She has trust in the quality of the product, and so it's all the experiences that a product offers the customer that the brand stands for. So the packaging, the design is part of that [] experience;"[169]

- The rounded bottom, "that's our brand. Our brand is all about curves and sensorial...[the] shape of the jar really amplifies the brand's personality;"[170] and

- "So we have a unique name which we worked very hard to come up with, and we said, let's shout it out. Why be subtle? Again, let's be bold."[171]

_____
(Exhibits 1-20), page 103.

[166] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), pages 122-123.

[167] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), page 125.

[168] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), pages 137-138.

[169] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), page 144.

[170] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), pages 164-165.

[171] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), page 173.

**83.**  Further, a Boston Consulting Group study performed prior to L'Occitane's acquisition of Sol de Janeiro states that Sol de Janeiro is recognized for its iconic packaging.[172]  Also, Ms. Bubitz of Costco testified that, "[Brazilian Bum Bum Cream was] trending very high on the internet so [Costco] just wanted to see if [Sol de Janeiro] would be open to working with [Costco],"[173] and that Brazilian Bum Bum Cream has name recognition.[174]  Additionally, a June 30, 2021 email from Mr. Wachsberg to Ms. Bubitz discussing potential names for the Accused Product states, "...but given the specific name recognition associated with 'Brazilian Bum Bum Cream', I'm thinking you may wish to focus on this particular equity in commercializing this opportunity for optimal awareness and success."[175]

**84.**  Apollo would consider its (as well as its customers) potential to benefit from the positive associations that consumers have with the Brazilian Bum Bum Cream brand and its Trade Dress and Trademark — including those from the significant historical and ongoing advertising and marketing expenditures by Sol de Janeiro, the press associated with Brazilian Bum Bum Cream, and Brazilian Bum Bum Cream's "buzz" — while enabling it and its customers to earn profits from selling the Accused Product.  The royalty would be the cost to Apollo of being a licensee and having rights to the Trade Dress and Trademarks, exchanged for the associated goodwill, marketing support, and other benefits described in this report, and in documents and testimony in this matter.

**85.**  Costco's launch of the Brazilian Body Butter Cream product, which benefited from use of the infringing Trade Dress and Trademarks, was described as successful. Ms. Bubitz wrote on July 12, 2022 that, "[t]his has been really exciting! By far our best launch!,"[176] based on the "sales and then the buzz that [Costco] was

---

[172] Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20), pages 252 and 255.

[173] Deposition of Lindsay Bubitz (Costco Buyer), August 25, 2023 (Exhibits 1-39), page 21.

[174] Deposition of Lindsay Bubitz (Costco Buyer), August 25, 2023 (Exhibits 1-39), page 117.

[175] Apollo0000075–Apollo0000083, at Apollo0000076.

[176] Costco0003923–Costco0003930, at Costco0003928.

getting from social media."[177]

**86.** As discussed previously, the net sales realized by Apollo and Costco, respectively, from their selling Brazilian Body Butter Cream were $14.43 million and $13.05 million.[178] The corresponding profits realized by Apollo and Costco, respectively, from their selling Brazilian Body Butter Cream were $6.06 million and $1.57 million.[179] I further analyzed and considered Apollo's gross profit margin and its corresponding capacity to pay a royalty. Apollo's historical gross profit margin associated with its selling Brazilian Body Butter Cream is nearly 50%.[180]

## v  Royalty Rate Conclusion

**87.** To determine a royalty rate for Apollo's use of the Trade Dress and Trademarks, I considered a number of factors as discussed in the preceding sections, including the nature of and use of the Trade Dress and Trademarks, and personal care products licensing information. I also considered the benefits and costs to Sol de Janeiro, the benefits to Apollo and its customers, and the competitive positioning of the companies.

**88.** Based on the information and analyses contained in this report, a hypothetical negotiation would result in a reasonable royalty rate for the Trade Dress and Trademarks of at least 8%. As a starting point for my royalty rate determination, I used the "benchmark" trademark royalty rate general ranges provided by RoyaltySource for personal care products that would include the Accused Product (5% to 8%)[181] and by *Licensing Royalty Rates* for International Class 3 (Cosmetics and Cleaning Preparation) product categories including body cream, lotions, and skin lotion (5% to 8%). I then considered, in particular, the following:

---

[177] Deposition of Lindsay Bubitz (Costco Buyer), August 25, 2023 (Exhibits 1-39), page 148.

[178] *See*, Tab 3 and Tab 4.

[179] *See*, Tab 3 and Tab 4.

[180] Calculation: 46.7% Brazilian Body Butter Cream gross profit margin = (net sales − COGS) ÷ net sales = ($14.43 million − $7.69 million) ÷ $14.43 million (*see*, Tab 3).

[181] Based on the first quartile of the low royalty rates and third quartile of the high royalty rates (see, Tab 6).

- The commercial relationship between Sol de Janeiro and Apollo (and its customers), such as, whether they are competitors selling the same type of product in the same territory. I understand that courts have concluded that an intellectual property owner's bargaining power is greater if the would-be licensee is a competitor.[182] Sol de Janeiro and Apollo (and its customers) are competitors insofar as Brazilian Bum Bum Cream and Brazilian Body Butter Cream are both body creams sold through retail channels throughout the U.S. In the selected RoyaltySource data summarized in Tab 6, as discussed previously, the licensors and licensees do not appear to be competitors selling, for example, an authentic and a "copycat" product;

- The risk of the lower-cost Accused Product harming the price premium and Brazilian Bum Bum Cream brand image cultivated over many years;

- Sol de Janeiro's widespread and successful use of the Trade Dress and Trademarks, as evidenced by over $100 million in cumulative sales and the "buzz" associated with Brazilian Bum Bum Cream;

- Sol de Janeiro's many millions of dollars in advertising/marketing expenditures over many years, as compared to those for Brazilian Body Butter Cream; and

- Costco and Apollo's communications evidencing the importance of the Accused Product mimicking Brazilian Bum Bum Cream.

Each of the above would put upward pressure on the royalty rate in this matter.

**89.** The hypothetical agreement between Sol de Janeiro and Apollo would be labeled non-exclusive, and the agreements presented in Tab 6 are typically exclusive. All else being equal, royalty rates for exclusive licenses are higher than those for non-exclusive licenses. This would put downward pressure on the royalty rate. However, a non-exclusive license with Apollo would effectively be an exclusive license (1) for

---

[182] *See, for example, Procter & Gamble Company v. Paragon Trade Brands, Inc.*, 989 F.Supp. 547 (D. Del 1997).

Highly Confidential — Attorneys' Eyes Only                                    46

a lower-priced "copycat" product and (2) for the mass-market retail sales channel because Sol de Janeiro is not, itself, selling into that channel.

90. When considered in totality, and in conjunction with my experience assisting intellectual property owners and licensees in licensing negotiations outside of litigation, the factors above indicate that a reasonable royalty rate in this case would be at the upper end of the observed industry range. Taking into consideration that this would be a non-exclusive license — albeit between competitors and effectively exclusive in the warehouse channel — it is my opinion that a reasonable royalty rate would be at least 8% of Apollo's wholesale sales of the Accused Product. A true royalty rate would likely be higher because, in practice, well-constructed trademark license agreements typically have quality control provisions over many aspects of the licensee's use of the licensed marks, but Sol de Janeiro was afforded no such oversight in this infringing situation, enhancing the risk to its brand beyond what would be contemplated in a standard personal care industry trademark license agreement.

91. Moreover, based on the views of both Sol de Janeiro and Professor Serdari, since this license agreement would cause the brand to be sold in channels such as Costco, the licensee's use would cause the brand to be "severely damaged and that damage will be very difficult to correct"[183] because of the brand's loss of its premium positioning and thus transition to competing on price,[184] which would likely reduce the non-royalty revenue (*i.e.*, the revenue that Sol de Janeiro realizes through, for example, Sephora) that Sol de Janeiro would earn. As discussed previously, all of the agreements presented in Tab 6 (with the possible exceptions of two agreements for which complete information is not available) explicitly provide for licensor quality control, approval, or similar provisions.[185]

---

[183] Expert Report of Thomaï Serdari, Ph.D., MBA, October 16, 2023, paragraph 6.

[184] Expert Report of Thomaï Serdari, Ph.D., MBA, October 16, 2023, paragraph 38.

[185] The two exceptions are Hand Perfection and Ellen Sirot (licensor), where the data does not provide the details of the agreement, but instead a summary; and Gucci (licensor), where the data comes from an industry article and thus does not provide the details of the agreement.

## C    Royalty Base

**92.** There are generally two potential royalty bases in this matter — wholesale revenue (*i.e.*, Apollo's sales to its customers) and retail revenue (*i.e.*, Apollo customers' sales to consumers). For my analysis, I used as the royalty base Apollo's net sales (*i.e.*, a form of wholesale revenue) from sales of the Accused Product. Such an arrangement would entail one hypothetical negotiation (between Sol de Janeiro and Apollo, as opposed to Sol de Janeiro needing to negotiate with every one of Apollo's customers). Based on my analysis of the information contained in the Counter-Defendants documents that I reviewed, and as shown in Tab 3, the royalty base is $14.43 million.

## D    Reasonable Royalty Damages

**93.** Based on the above-discussed royalty rate and royalty base, I multiplied Apollo's Accused Product revenue from June 2022 through July 2023 (the royalty base) ($14.43 million) by the corresponding wholesale-level royalty rate for the Trade Dress and Trademarks (at least 8%). This results in reasonable royalty damages to Sol de Janeiro due to Apollo's alleged infringement of the Trade Dress and Trademarks. If liability is found against Apollo and it is determined that reasonable royalty damages are appropriate to award Sol de Janeiro, then these reasonable royalty damages are at least $1.15 million.[186]

# VII    CONCLUSION

**94.** Based on my analysis of the documents and other information produced in this matter, my research, and my education and experience, I have determined:[187]

---

[186] *See*, Tab 5.

[187] This opinion may be supplemented based on additional information, expert reports, deposition transcripts, or other data that may be made available to me in the future. I reserve the right to update my analysis if additional records, data, or information are furnished to me.

- Apollo realized net sales of $14.43 million from selling the Accused Product in the U.S. during the period from June 2022 through July 2023;[188]

- To estimate Apollo's profits from selling the Accused Product, I deducted an estimate of Apollo's cost of goods sold for the Accused Product and its expenses in advertising the Accused Product and in reimbursing Costco for implemented price discounts, which result in Apollo profits from selling the Accused Product in the U.S. of $6.06 million during the period from June 2022 through July 2023;[189]

- Costco realized net sales of $13.05 million from selling the Accused Product in the U.S. (covering the date range from January 1, 2022 through August 6, 2023);[190]

- To estimate Costco's gross profits from selling the Accused Product, I deducted Costco's cost of goods sold, referred to by Costco as "Cost (Apollo)," for the Accused Product, which results in Costco gross profits from selling the Accused Product in the U.S. of $1.57 million (covering the date range from January 1, 2022 through August 6, 2023);[191] and

- If the fact-finder determines that Sol de Janeiro has been harmed by the actions of Counterclaim-Defendants and that reasonable royalty damages are an appropriate means to compensate Sol de Janeiro for that harm — a reasonable royalty can be calculated as: royalty base × royalty rate. An appropriate royalty base would be Apollo's net sales of the Accused Product in the U.S., and the royalty rate applied to the royalty base would be at least 8%.[192] The resulting reasonable royalty damages are at least $1.15 million.[193]

---

[188] *See*, Tab 3.
[189] *See*, Tab 3.
[190] *See*, Tab 4.
[191] *See*, Tab 4.
[192] For my analysis, I have modeled that Apollo would bear the royalty burden, and thus could sell its Brazilian Body Butter Cream to the customers that it did without infringing.
[193] Calculation: $1.15 million = royalty base ($14.43 million) × royalty rate (at least 8%). *See*, Tab 5.

Highly Confidential — Attorneys' Eyes Only 49

_____

John G. Plumpe

October 16, 2023

# Tab 1



## John G. Plumpe
**Managing Director**

Epsilon Economics                                    Office:   312.637.2943
111 South Wacker Drive; 50th Floor                   Mobile:  773.213.3962
Chicago, Illinois 60606

jplumpe@epsiloneconomics.com

## Summary

John Plumpe is a Managing Director of Epsilon Economics.  Mr. Plumpe specializes in analyzing the economic aspects of intellectual property, and provides litigation and valuation expert services involving trademarks/trade dress, false advertising, patents, trade secrets, copyrights, and other intangible assets. Since 1999 he has worked with plaintiffs and defendants in the analysis and reporting of lost profits, defendant's profits, reasonable royalties, brand value, and other forms of monetary relief in intellectual property infringement, breach of contract, and related matters. Mr. Plumpe has testified at trial in federal district court, in deposition, and in arbitration on issues including intellectual property damages, monetary relief, and valuation; breach of contract damages; licensing; business valuation; false advertising monetary relief; defamation damages; economic aspects of irreparable harm; and commercial success.

Mr. Plumpe also consults on engagements involving the valuation of businesses and intellectual property for financial reporting, mergers and acquisitions, joint ventures, licensing transactions, bankruptcy proceedings, transfer pricing, financing, and tax purposes. In addition, he assists clients in developing and implementing strategies and processes for managing and commercializing their intellectual property portfolios.

Mr. Plumpe is the author of several published articles regarding intellectual property valuation, due diligence, and monetary relief. He has also spoken to legal organizations and taught law school classes on these subjects.



Prior to joining Epsilon Economics, Mr. Plumpe was a Principal in the intellectual property practice of Charles River Associates. Previously, he worked in the management consulting practice of a Big Four public accounting firm, assisting an Internet startup with a new product strategy. In addition, he worked for two national engineering and architecture firms, helping clients optimize the energy efficiency of their buildings and campuses through the analysis and design of HVAC systems. He has published two papers in technical research journals regarding multiphase fluid dynamics.

Mr. Plumpe is on the Board of Directors of the Lawyers for the Creative Arts. Lawyers for the Creative Arts provides pro bono legal assistance to clients in all areas of art, culture, media, and entertainment, including the visual, literary, and performing arts.

## Education

- M.B.A., University of Chicago Booth School of Business

- M.S., Mechanical Engineering, University of Illinois

- B.S., Mechanical Engineering, University of Illinois

## Professional Affiliations

- International Trademark Association:
    - Co-Chair, 2022 Presidential Task Force on Intellectual Property Reporting
    - IP Accounting & Brand Valuation Standards Project Team
    - Brand Valuation Project Team
    - Building Bridges Committee (Chair of Financial and Standard-Setting Subcommittee)
    - Enforcement Committee (Discovery Practices & Procedures Subcommittee)
    - Government Officials Education & Training Committee
    - Leadership Development Committee
- Intellectual Property Owners Association: U.S. Trademark Law Committee (previously Chair of Monetary Relief working group)

- World Intellectual Property Organization (WIPO): 2023 Expert Consultative Group on Valuation of Intangible Assets

- Lawyers for the Creative Arts: Board of Directors

## Professional Experience

- **Epsilon Economics**
  2017 – present

- **Charles River Associates / InteCap, Inc.**
  1999 - 2017

## Expert Testimony (Past Four Years)

- Fujifilm North America Corporation v. PLR IP Holdings, LLC, *et al.*
  Case No. 1:17-cv-08796
  United States District Court, Southern District of New York
  Deposition Testimony

- Security Bank & Trust Company, Personal Representative of the Estate of Kurt A. Amplatz v. Cook Incorporated, *et al.*
  Case No. 0:21-cv-02572
  United States District Court, District of Minnesota
  Deposition Testimony

- Trojan Battery Company, LLC v. Trojan EV, LLC, *et al.*
  Case No. 4:21-cv-3075
  United States District Court, Southern District of Texas
  Trial Testimony

- Delta Air Lines, Inc. v. Marriott International, Inc.
  Case No. 1:20-cv-01125
  United States District Court, Northern District of Georgia
  Deposition Testimony

- Galderma Laboratories, L.P. v. Chad Tisckos
  Case No. 2:21-cv-05522
  United States District Court, Central District of California
  Deposition Testimony

- Edible IP, LLC, *et al.* v. 1-800-FLOWERS.COM, Inc., *et al.*
  Case No. 1:20-cv-02405
  United State District Court, Northern District of Georgia
  Deposition Testimony



- Guantanamera Cigars Company v. SMCI Holding, Inc., *et al.*
  Case No. 1:21-cv-21714
  United States District Court, Southern District of Florida
  Trial Testimony

- adidas America, Inc., *et al.* v. Thom Browne, Inc.
  Case No. 1:21-cv-05615
  United States District Court, Southern District of New York
  Trial Testimony

- Trojan Battery Company, LLC v. Trojan EV, LLC, *et al.*
  Case No. 4:21-cv-3075
  United States District Court, Southern District of Texas
  Deposition Testimony

- ExxonMobil Oil Corporation v. Landmark Industries, LLC, *et al.*
  Case No. 01-21-0018-1042
  American Arbitration Association
  Arbitration Testimony

- adidas America, Inc., *et al.* v. Thom Browne, Inc.
  Case No. 1:21-cv-05615
  United States District Court, Southern District of New York
  Deposition Testimony

- In Re: The Marriage of: Linda Marie Bollea and Terry Gene Bollea v.
  TGB Family Limited Partnership, II, *et al.*
  Case No. 07-DR-013355-FD-14
  Circuit Court of the Sixth Judicial Circuit, Pinellas County Florida, Family Law Division
  Trial Testimony

- Art Akiane LLC v. Art & SoulWorks LLC
  Case No. 1:19-cv-02952
  United States District Court, Northern District of Illinois
  Deposition Testimony

- Thrive Natural Care, Inc. v. Le-Vel Brands, LLC
  Case No 2:21-cv-02022
  United States District Court, Central District of California
  Deposition Testimony

- Delta T, LLC v. Kale Fans America S.A. DE C.V., *et al.*
  Case No. 6:20-cv-170-40EJK
  United States District Court, Middle District of Florida
  Deposition Testimony



- CareDx, Inc. v. Natera, Inc.
  Case No. 1:19-cv-00662
  United States District Court, District of Delaware
  Trial Testimony

- adidas America, Inc., *et al.* v. Fashion Nova, Inc.
  Case No. 3:19-cv-00740
  United States District Court, District of Oregon
  Deposition Testimony

- Mountaineers Foundation v. The Mountaineers
  Case No. 2:19-cv-01819
  United States District Court, Western District of Washington
  Deposition Testimony

- Orange Bang, Inc., *et al.* v. Vital Pharmaceuticals, Inc.
  Case No. 01-20-0005-6081
  American Arbitration Association
  Arbitration Testimony

- Wildfang Co. v. Target Corporation, *et al.*
  Case No. 3:20-cv-00195
  United States District Court, District of Oregon
  Deposition Testimony

- Orange Bang, Inc., *et al.* v. Vital Pharmaceuticals, Inc.
  Case No. 01-20-0005-6081
  American Arbitration Association
  Deposition Testimony

- Storage Cap Management LP v. Robarco, Inc. and SpareSpace Storage, LLC
  Case No. 2:19-cv-04328
  United States District Court, Southern District of Ohio
  Deposition Testimony

- Colony Grill Development, LLC, *et al.* v. Colony Grill, Inc., *et al.*
  Case No. 3:20-cv-00213
  United States District Court, District of Connecticut
  Deposition Testimony

- PayCargo, LLC v. CargoSprint, *et al.*
  Case No. 1:19-cv-22995
  United States District Court, Southern District of Florida
  Trial Testimony



- PayCargo, LLC v. CargoSprint, *et al.*
  Case No. 1:19-cv-22995
  United States District Court, Southern District of Florida
  Deposition Testimony

- Telebrands Corp. v. My Pillow, Inc.
  Case No. 1:18-cv-6318
  United States District Court, Northern District of Illinois
  Deposition Testimony

- Maglula, Ltd. v. Amazon.com, Inc., *et al.*
  Case No. 1:19-cv-01570
  United States District Court, Eastern District of Virginia
  Deposition Testimony

- Greater Orlando Aviation Authority v. Melbourne Airport Authority
  Case No. 6:19-cv-00540
  United States District Court, Middle District of Florida
  Deposition Testimony

- CareDx, Inc. v. Natera, Inc.
  Case No. 1:19-cv-00662
  United States District Court, District of Delaware
  Deposition Testimony

- Emerson Radio Corporation v. Emerson Quiet Kool Co. Ltd., *et al.*
  Case No. 2:17-cv-05358
  United States District Court, District of New Jersey
  Deposition Testimony

- Syntel Sterling Best Shores Mauritius Limited, *et al.* v. The TriZetto Group, Inc., *et al.*
  Case No. 1:15-cv-00211
  United States District Court, Southern District of New York
  Trial Testimony

- Deckers Outdoor Corporation v. Target Corporation
  Case No. 2:19-cv-06215
  United States District Court, Central District of California
  Deposition Testimony

- Club Champion LLC v. True Spec Golf LLC
  Case IPR2019-01148
  United States Patent and Trademark Office, Patent Trial and Appeal Board
  Deposition Testimony

**epsilon**
economics

- American Society of Home Inspectors, Inc. v. International Association of Certified Home Inspectors, *et al.*
  Case No. 1:18-cv-01797
  United States District Court, District of Colorado
  Deposition Testimony

- Bluetooth SIG, Inc. v. FCA US LLC
  Case No. 2:18-cv-01493
  United States District Court, Western District of Washington
  Deposition Testimony

## Speeches and Publications (Past Ten Years)

- "Intellectual Property Reporting for Brands: IP Valuation," Miami-Dade Bar Association, May 2022.

- "Recent Trends in Monetary Relief in Lanham Act Litigation Matters in the United States," International Trademark Association - Annual Meeting, May 2022.

- "The Business of Brands: The Interplay Between Brand Value and ESG Initiatives," Moderator, International Trademark Association - Annual Meeting, May 2022.

- "Recent Trends in Monetary Relief in Lanham Act Litigation Matters in the United States," International Trademark Association - Annual Meeting, May 2019.

- "Recent Trends in Monetary Relief in Lanham Act Litigation Matters in the United States," International Trademark Association - Annual Meeting, May 2018.

- "Show Me The Money! A Primer on Lanham Act Damages," New York Intellectual Property Law Association, November 2016.

- "Litigation Strategies: New U.S. Federal Trade Secrets Law," Meritas U.S./Canada Litigation and Labor & Employment Group Joint Fall Meeting, October 2016.

- "Current Trends and Topics on Monetary Relief in Lanham Act Litigation in the United States," International Trademark Association - Annual Meeting, May 2016.

- "An Introduction to Trademark Valuation and Infringement Damages," presented to Chicago-Kent College of Law, Trademarks and Unfair Competition Class, March 2016.



- "The Rise of SVOD: How the Growth of Subscription Video-on-Demand Impacts Copyright Holders," with Ben W. Sheppard, Landslide, ABA Section of Intellectual Property Law, September/October 2015.

- "Federal Circuit Provides Guidance on Jury Instructions on Apportionment of Patent Damages," with Kimberly J. Schenk, New York State Bar Association Intellectual Property Section Bright Ideas, Spring/Summer 2015.

- "Calculation of Damages in Trademark Infringement Cases," International Trademark Association - Annual Meeting, May 2015.

- "Monetary Relief Under the Lanham Act," presented to the John Marshall Law School, Advanced Trademark Law Class, March 2015.

- "An Introduction to Trademark Valuation and Infringement Damages," presented to Chicago-Kent College of Law, Trademarks and Unfair Competition Class, March 2015.

- "Profit Apportionment in Intellectual Property Damages: The Unique Case of Design Patents," with Kimberly J. Schenk, NYIPLA Bulletin, December 2014/January 2015.

- "An Introduction to Trademark Valuation and Infringement Damages," presented to Chicago-Kent College of Law, Trademarks and Unfair Competition Class, April 2014.

- CRA Insights: Intellectual Property, co-editor, Charles River Associates quarterly newsletter, 2014- 2016.

# Tab 2

# List of Materials Considered

**Pleadings and Other Court Documents**

1. Answer to Second Amended Complaint and Amended Counterclaims of Defendants, August 24, 2023.

2. Counterclaim-Defendant Costco Wholesale Corp.'s Second Amended Rule 26(A)(1) Initial Disclosure, August 22, 2023.

3. Defendant Sol de Janeiro USA Inc.'s Objections and Responses to Plaintiff Apollo Health and Beauty Care's First Set of Interrogatories, March 13, 2023.

4. Defendant Sol de Janeiro USA Inc.'s Objections and Responses to Plaintiff Apollo Health and Beauty Care's Fourth Set of Interrogatories, September 5, 2023.

5. Defendants/Counterclaim-Plaintiffs' Initial Disclosures, January 31, 2023.

6. Plaintiff Apollo Healthcare Corp.'s Answer and Affirmative Defenses to Defendants' Amended Counterclaims, September 7, 2023.

7. Plaintiff Costco Wholesale Corp.'s Answer and Affirmative Defenses to Defendants' Amended Counterclaims, September 7, 2023.

8. Plaintiff's First Amended Rule 26(A)(1) Initial Disclosure, August 14, 2023.

**Expert Reports**

1. Expert Report of Thomaï Serdari, Ph.D., MBA, October 16, 2023.

**Depositions**

1. Deposition of Atsushi Hayakawa (Sol de Janeiro CFO), September 14, 2023 (Exhibits 1-9).

Tab 2

2. Deposition of Charlie Wachsberg (Apollo Co-CEO), September 15, 2023 (Exhibits 4-9, 16-17, 19-20, 22-23, 28, 30, 32, 39, 44, 47-49, 52, and 66-70).

3. Deposition of Gus Monson (Costco VP Finance), September 19, 2023 (Exhibits 34-38, 42, and 74-76).

4. Deposition of Haley Menkis (Brand & Product Consultant for Sol de Janeiro), September 8, 2023 (Exhibits 1-21).

5. Deposition of Heela Yang Tsuzuki (Sol de Janeiro Co-Founder and CEO), September 12, 2023 (Exhibits 1-20).

6. Deposition of Lindsay Bubitz (Costco Buyer), August 25, 2023 (Exhibits 1-39).

7. Deposition of Luai Bashori (Apollo CFO), September 13, 2023 (Exhibits 56-65).


*Discussions*

1. Interview of Haley Menkis, Brand & Product Consultant for Sol de Janeiro.


*Financial Information*

1. CCA Industries, Inc., Form 10-K, for the fiscal year ended November 30, 2018.

2. Costco Wholesale Corporation, Form 10-K, for the fiscal year ended August 28, 2022.

3. Inter Parfums, Inc. Form 8-K, November 26, 2007.


*Websites*

1. <www.apollocorp.com/about>.

Tab 2

2. <www.apollocorp.com/distribution>.

3. <www.apollocorp.com/products>.

4. <www.barrons.com/market-data/stocks/nugn>.

5. <www.bloomberg.com>.

6. <www.elcompanies.com/en>.

7. <www.glamour.com/story/glamour-beauty-awards-readers-choice-skin-nominees>.

8. <www.interparfumsinc.com/about-us>.

9. <www.investopedia.com/terms/i/impression>.

10. <www.linkedin.com/company/parlux-fragrances>.

11. <www.linkedin.com/in/ellensirot>.

12. <www.soldejaneiro.com/pages/our-story>.

13. <www.soldejaneiro.com/products/brazilian-bum-bum-cream>.

14. <www.tmsearch.uspto.gov/>.

15. <www.vogue.co.uk/gallery/vogue-beauty-awards-winners>.

16. <www.web.archive.org/web/20200809112223/https:www.newbeauty.com/awards-glow-getters/>.

17. <www.web.archive.org/web/20201205221109/https:www.influenster.com/awards/2019/winners>.

Tab 2

*Statutes and Cases*

1. 15 U.S.C. §1117(a).

2. *adidas America, Inc. and adidas-Solomon AG v. Payless Shoesource, Inc.*, 3:01-cv-01655-KI, Dkt. 860 (May 1, 2008).

3. *adidas America, Inc. and adidas-Solomon AG v. Payless Shoesource, Inc.*, 3:01-cv-01655-KI, Dkt. 942 (September 12, 2008).

4. *A & H Sportswear Co., Inc. v. Victoria's Secret Stores, Inc.*, 967 F.Supp. 1457 (1997).

5. *Buffalo Wild Wings, Inc. v. Buffalo Wings & Rings*, Civil No. 09-1426 (JRT/SER) (September 29, 2011).

6. *Burndy Corp. v. Teledyne Industries, Inc.*, 748 F.2d 767, 772 [2d Cir. 1984].

7. *Choice Hotels International, Inc. v. Goldmark Hospitality, LLC, et al.*, Civil Action No. 3:12-CV-0548-D (February 19, 2014).

8. *Georgia-Pacific v. United States Plywood Corporation*, 318 F.Supp. 1116 (S.D.N.Y. 1970).

9. *Gucci Am., Inc. v. Guess?, Inc.*, 858 F.Supp.2d 250, 255–56 (S.D.N.Y. 2012).

10. *ITT Corp. v. Xylem Group, LLC*, 963 F.Supp.2d 1309 (2013).

11. *On Site Energy Co. v. MTU Onsite Energy Corp.*, No. 10-CV-1671 JS WDW, 2012 WL 2952424, at *2 (E.D.N.Y. July 19, 2012).

12. *Procter & Gamble Company v. Paragon Trade Brands, Inc.*, 989 F.Supp. 547 (D. Del 1997).

13. *QS Wholesale, Inc. v. World Marketing, Inc.*, No. SA 12-CV-0451(RNBx) (May 9, 2013).

*Books, Articles, and Other Information*

1. Brooks Brothers Manufacturing and License Agreement between Retail Brand Alliance, Inc., d/b/a Brooks Brothers and Inter Parfums USA, LLC, effective 2008.

Tab 2

2.  Christopher P. Gerardi, Dawn R. Hall, and Juli Saitz, "Calculating Infringer's Profits in 'Soft' Intellectual Property Disputes: Trademark, Copyright, and Design Patent Cases," *Litigation Services Handbook: The Role of the Financial Expert*, Sixth edition, eds. Roman L. Weil, Daniel G. Lentz, and Elizabeth A. Evans, John Wiley & Sons, 2017.

3.  Gregory J. Battersby, Charles W. Grimes, "Licensing Royalty Rates," Wolters Kluwer Legal & Regulatory U.S., 2018.

4.  "Gucci, Guess Square Off in Trademark Dispute," *Women's Wear Daily* (Section: 1, Pg. 1, Vol. 203, No. 65 ISSN: 0149-5380, March 29, 2012.

5.  Kerry Olsen, "Gucci, Procter & Gamble Extend Pact," Women's Wear Daily, January 27, 2011.

6.  Level Brands, Inc. Prospectus, April 9, 2019.

7.  License Agreement among Aerin LLC, Aerin Lauder Zinterhofer and Estee Lauder Inc., April 6, 2011.

8.  License Agreement between I|M1, LLC and NuGene International, Inc., March 31, 2017.

9.  License Agreement between J Choo Limited and Inter Parfums SA, September 29, 2009.

10. License Agreement between Nine West Development Corporations and Inter Parfums USA, LLC, July 21, 2010.

11. "Licensing, Royalty Rates, and Valuation," in: Gordon V. Smith and Russell L. Parr, VALUATION OF INTELLECTUAL PROPERTY AND INTANGIBLE ASSETS, Third Edition, John Wiley & Sons, Inc., 2000.

12. Russ O'Haver and Brian Finnegan, "Estimating the Effects of Exclusivity and Geographic Market Characteristics on Royalty Rates: Some Preliminary Results," Ernst & Young LLP, 1993.

13. "Sephora signs contract with Kohl's as it plans to phase out of J.C. Penney," The Dallas Morning News, December 1, 2020.

14. Stuart Whitwell, "Brand Valuation News: The power of brands – understanding royalty rates," Intangible Business, April 2013.

15. "The Body Care Brand that Brings a Sunny Brazilian Beach to Your Bathroom," InStyle, September 15, 2021.

Tab 2

16. Thomas R. Varner, "An Economic Perspective on Patent Licensing Structure and Provisions," *les Nouvelles*, March 2012.

17. Tim Heberden, "Intellectual Property Valuation and Royalty Determination," Wolters Kluwer Law & Business, 2011.

18. Trademark License Agreement among Guess?, Inc., Guess? IP Holder L.P. and Parlux Fragrances, November 1, 2003.

19. Trademark License Agreement between QS Holdings SARL and Inter-Parfums, March 23, 2006.

Tab 2

**Bates Numbered Documents**

1. Apollo0000052–Apollo0000055
2. Apollo0000075–Apollo0000083
3. Apollo0000180–Apollo0000191
4. Apollo0000197–Apollo0000198
5. Apollo0000247
6. Apollo0000254–Apollo0000319
7. Apollo0000320–Apollo0000322
8. Apollo0001191–Apollo0001194
9. Apollo0001195–Apollo0001199
10. Apollo0001270–Apollo0001272
11. Apollo0001337
12. Apollo0001345
13. Apollo0001346
14. Apollo0003215
15. Apollo0003216
16. Apollo0003217–Apollo0003221
17. Costco0000595–Costco0000601
18. Costco0000810–Costco0000813
19. Costco0000835–Costco0000841
20. Costco0000867
21. Costco0000870
22. Costco0000875–Costco0000876
23. Costco0000884–Costco0000886
24. Costco0000902–Costco0000906
25. Costco0000946–Costco0000947
26. Costco0000963–Costco0000970
27. Costco0000963–Costco0000977
28. Costco0000971–Costco0000977
29. Costco0000978–Costco0000986
30. Costco0000987–Costco0000996
31. Costco0000997–Costco0001007
32. Costco0001008–Costco0001018
33. Costco0001251–Costco0001264
34. Costco0001296
35. Costco0001520
36. Costco0001521
37. Costco0001553–Costco0001555
38. Costco0001556–Costco0001557
39. Costco0001598–Costco0001600
40. Costco0001658
41. Costco0001801–Costco0001817
42. Costco0001950–Costco0001951
43. Costco0001952
44. Costco0002296–Costco0002302
45. Costco0002303
46. Costco0003881
47. Costco0003893–Costco0003897
48. Costco0003923–Costco0003930
49. Costco0003941
50. Costco0003943
51. Costco0003944–Costco0004029
52. Costco0004030–Costco0004105
53. Costco0004106–Costco0004142
54. Costco0004143–Costco0004178
55. Costco0004179–Costco0004215
56. Costco0004216–Costco0004249
57. Costco0004250–Costco0004314
58. Costco0004315–Costco0004349
59. Costco0004350–Costco0004382
60. Costco0004383–Costco0004420
61. Costco0004433
62. Costco0004434
63. Costco0004435
64. Costco0004436
65. Costco0004437
66. Costco0004450–Costco0004454
67. Costco0004471
68. Costco0004474
69. Costco0004475
70. SDJ 0000316–SDJ 0000318
71. SDJ 0000328

Tab 2

72. SDJ 0000330

73. SDJ 0000333

74. SDJ 0000334

75. SDJ 0000338

76. SDJ 0000341

77. SDJ 0000498–SDJ 0000507

78. SDJ 0000555–SDJ 0000573

79. SDJ 0000574–SDJ 0000581

80. SDJ 0000582–SDJ 0000617

81. SDJ 0000618–SDJ 0000636

82. SDJ 0000637–SDJ 0000645

83. SDJ 0000646–SDJ 0000670

84. SDJ 0000671–SDJ 0000721

85. SDJ 0000741–SDJ 0000748

86. SDJ 0000749–SDJ 0000754

87. SDJ 0000755–SDJ 0000759

88. SDJ 0000760–SDJ 0000799

89. SDJ 0000901

90. SDJ 0000902

91. SDJ 0000904

92. SDJ 0000909

93. SDJ 0000922

94. SDJ 0001563–SDJ 0001567

95. SDJ 0001641

96. SDJ 0001642

97. SDJ 0001644

98. SDJ 0001651

99. SDJ 0001652

100. SDJ 0001654

101. SDJ 0001655

102. SDJ 0001656–SDJ 0001676

103. SDJ 0001696–SDJ 0001706

104. SDJ 0001707–SDJ 0001717

105. SDJ 0001718–SDJ 0001728

106. SDJ 0001729–SDJ 0001739

107. SDJ 0001743–SDJ 0001774

108. SDJ 0001775–SDJ 0001781

109. SDJ 0001784–SDJ 0001791

110. SDJ 0001792–SDJ 0001794

111. SDJ 0001951

112. SDJ 0002154–SDJ 0002165

113. SDJ 0002166–SDJ 0002171

114. SDJ 0002236–SDJ 0002240

115. SDJ 0002247–SDJ 0002252

116. SDJ 0002296

117. SDJ 0002370

118. SDJ 0002840–SDJ 0002846

119. SDJ 0002859–SDJ 0002865

120. SDJ 0002883–SDJ 0002889

121. SDJ 0003018–SDJ 0003136

Tab 2

# Tab 3

# Apollo Accused Product Financial Data

| Customer | 2022 [1] | 2023 [2] | Sub-Total I | Sub-Total II | Total |
|---|---|---|---|---|---|
| **Gross Sales ($)** | | | | | |
| Amazon Market Place [3] | $22,821 | $83,026 | $105,847 | | $105,847 |
| BJ Wholesale Club [3] | $188,528 | ($45,336) | $143,191 | | $143,191 |
| Costco Wholesale - US [3] | $5,902,344 | $7,120,680 | $13,023,024 | | $13,023,024 |
| Sam's Club [3] | $0 | $1,053,513 | $1,053,513 | | $1,053,513 |
| | | | | | |
| Costco Wholesale - US [4] | $131,712 | $444,528 | | $576,240 | $576,240 |
| PriceSmart [4] | $0 | $26,796 | | $26,796 | $26,796 |
| | | | | | |
| Total | $6,245,404 | $8,683,207 | $14,325,575 | $603,036 | $14,928,611 |
| | | | | | |
| Gross Sales | | | $14,325,575 | $603,036 | $14,928,611 |
| **Net Sales** [5] | | | $13,845,393 | $582,823 | **$14,428,216** |
| Cost of Goods [6] | | | $7,377,949 | $310,575 | $7,688,524 |
| Additional Expenses | | | | | |
| Connection [7] | $176,500 | $194,150 | $370,650 | | $370,650 |
| Temporary Price Discount [8] | $304,330 | | $304,330 | | $304,330 |
| | | | | | |
| **Profit** | | | | | **$6,064,711** |

**Notes & Sources:**

[1] 2022 data from June and [2] 2023 data through July.

[3] Apollo0003215, at Tab "Summary."

[4] Apollo0001346 *less* Apollo0003215. This difference accounts for Costco sales that were ultimately made outside of the U.S., but went through the Costco U.S. channel (Deposition of Luai Bashori, September 13, 2023, pages 103-104); and accounts for PriceSmart's purchases in the U.S. that were ultimately sold outside of the U.S. channel (Deposition of Luai Bashori, September 13, 2023, page 110).

[5] = $603,036 x ($13.85 million ÷ $14.33 million).

[6] = $582,823 x ($7.38 million ÷ $13.85 million).

[7] See Tab 4.

[8] See Tab 4. Mr. Bashori testified that the Costco product discount after a product has been sold for a time (i.e., the Temporary Price Discount) is not included in the "Sales Discounts & Allowances" line item that is deducted from Apollo's gross sales to determine net sales (Deposition of Luai Bashori (Apollo CFO), September 13, 2023,  pages 116-118; and Apollo0003215, Tab "Gross to Net Sales").

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY

Tab 3

Tab 4

# Costco Wholesale Accused Product Financial Data

| Description | 2022 [1] | 2023 [1] | Total |
|---|---|---|---|
| Gross Sales | $6,715,682 | $6,631,500 | $13,347,182 |
| **Net Sales** | $6,414,092 | $6,631,500 | **$13,045,592** |
| Cost (Apollo) - $17.15 per unit | $5,776,669 | $5,700,849 | $11,477,517 |
| **Gross Margin** | $637,423 | $930,651 | **$1,568,075** |
| Units (sold) | 336,832 | 332,411 | 669,243 |
| Units (purchased) | 346,944 | 415,200 | 762,144 |
| Apollo Spend | | | |
| Connection [2] | $176,500 | $194,150 | $370,650 |
| Temporary Price Discount [3] | $304,330 | | $304,330 |

### Notes & Sources:

Costco0003943.

[1] 2022 first sale date not provided, but data covers full year 2022; and 2023 data through August 6.

[2] Connection is a magazine for Costco members. "The Costco Connection is one of our main forms of advertisement because we don't do outside advertising...the only form of advertisement that is connected to Costco is the Costco Connection or our Costco-branded Instagram, Facebook and Pinterest pages" (Deposition of Lindsay Bubitz, August 25, 2023, pages 121-122).

[3] I understand that Apollo reimburses Costco for "markdowns." For example, for a Costco $5 markdown, "Apollo would cover the five dollar difference to get the item out. So if it was 19.99, we mark it down the five dollars to let's say 14.97. Apollo would cover the five dollars per unit that we have on hand of the marked down price" (Deposition of Lindsay Bubitz, August 25, 2023, page 103).

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY

Tab 4

# Tab 5

# Reasonable Royalty Damages

| Description | Total |
|---|---|
| Royalty Base [1] | $14,428,216 |
| Royalty Rate [2] | 8% |
| **Reasonable Royalty Damages** | **$1,154,257** |

**Notes & Sources:**

[1] Tab 3.
[2] See Expert Report of John G. Plumpe.

# Tab 6

# Royalty Rate Data

| No. | Licensor | Licensor Description | Licensee | Date | Term | Licensed Trademark(s) | Products Detail | Licensed Use | Exclusivity | Territory | Upfront Fee | Royalty (low) | Royalty (high) | Minimum Royalty | Royalty Base | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Aerin LLC and Aerin Lauder Zinterhofer | Clothing and beauty products manufacturing company | Estee Lauder Inc. | 4/6/2011 | 5 years | AERIN and "A in a box"; Aerin Lauder Zinterhofer's identifiers (e.g., name, signature, photograph, image, likeness, etc.); and Ancillary IP (all copyrights, design patents, and trade dress rights) | Core Beauty Products: cosmetics, fragrances, toiletries, skin care, hair care, gift sets and value sets consisting of any of the foregoing, beauty accessories and products and services related to all of the foregoing<br><br>Non-Core Beauty Products: cosmetic bags sold empty, tote bags, and fragranced candles and products and services customarily associated with all of the foregoing | In connection with the manufacture, distribution, sale, advertising, and promotion of the Core and Non-Core Beauty Products | Exclusive for Core Beauty Products<br><br>Non-exclusive for Non-Core Beauty Products | Worldwide | | 4% | 5% | | Net sales | 4% Royalty: cosmetic product sales up to $40M in any given annual period; 5% Royalty: all fragrance product sales, and cosmetic product sales in excess of $40M in any given annual period<br><br>Licensee's minimum advertising and promotion spend of 20% of net sales in any annual period during the initial term and 15% of net sales in any term thereafter<br><br>No less than ten personal appearances by Aerin Lauder Zinterhofer related to the promotion of Licensed Products during each Annual Period during which there is an applicable Product Launch |
| 2 | Guess?, Inc. and GUESS? IP Holder L.P. | Famous designer and manufacturer of fashionable clothing and fashion accessories and other products | Parlux Fragrances, Inc. | 11/1/2003 | 6 years (with 5 year extension term) | GUESS, GUESS?, and GUESS? and TRIANGLE DESIGN; and the IP Rights | Men's and women's fragrances and related personal beauty care products such as body lotion, body crème, body mist, hand crème, bath and shower gel, massage oil, dusting powder, after shave, after shave balm or gel, deodorant stick and bath soap | In connection with the manufacture of Products, distribution at wholesale and Advertising of the Products | Exclusive | Worldwide | $100,000 (credited against royalties) | 5% | 5% | $750,000, beginning in the first contract year and increasing to $2.2M by the tenth contract year | Net sales (calculation based on MSRP for the Products) | Licensee shall expend 20% of the net sales on advertising, and pay GUESS 3% of the greater of net sales and minimum net sales for advertising per contract year |
| 3 | Hand Perfection LLC and Ellen Sirot | Ellen Sirot: A hand model who developed an anti-aging hand care and skin care line | CCA Industries, Inc. | 10/21/2010 | | Hand Perfection and Foot Perfection; and the name Ellen Sirot | Group of skin care creams | Manufacture and market the Products | Exclusive | | | 7% | 7% | | Net sales | |
| 4 | IJM1, LLC | Men's lifestyle brand focused on millennials | NuGene International, Inc. | 3/31/2017 | 5 years | IJM1 and IM1 marks; and name, likeness, and visual representations | Skin care or other "age-defying products that are stem cell derived or which contain biologically active or biologically derived ingredients" | For the sale, marketing and distribution of the Licensed Products for use by men or in the men's market | Non-Exclusive | U.S. | | 5% | 5% | | Gross sales | Any mass market and low tier department stores, as well as club stores, are excluded from the approved Channels |
| 5 | J Choo Limited | Luxury lifestyle accessory brand with women's shoes and handbags | Inter Parfums SA | 9/29/2009 | 12 years | Choo, Jimmy Choo and others | Luxury fragrances and cosmetic products limited to bath and body products, to the exclusion of skin care and makeup products | In connection with the development, manufacture, sale, distribution, advertising, merchandising, promotion and marketing of the Products | Exclusive | Worldwide | | 7% | 7% | €400,000 in the first year of the agreement, increasing to €1.6 million in the final year | Net wholesale sales (US) | Licensee undertakes to spend for advertising and marketing: €5 million (2010) €8 million (2011) €10 million (2012) 40% of Net Sales in 2013, decreasing to 21% of Net Sales by 2016, remaining at 21% through the remainder of the agreement |
| 6 | Nine West Development Corp. | Textile products and apparel manufacturer | Inter Parfums USA, LLC | 7/21/2010 | 6 years (with 2 3-year extension options) | NINE WEST and all variations and deviations | Fragrances (Perfume, Eau de Perfume, Eau de toilette, cologne), as well as corresponding ancillaries (shower gel, body lotion, body cream, body spray, soap, shaving products, deodorant)<br><br>Cosmetics (blushers, eye makeup, face powders, lipsticks, colored lip balms and lip glosses, makeup bases), and nail color (nail polish) | To develop, produce, manufacture, market, advertise, distribute, promote, and sell Licensed Articles | Exclusive | Worldwide | | 7% | 7% | $140,000 in the first year of the agreement, increasing to $290,500 in the sixth year<br><br>7% of minimum net sales from the seventh year onwards | Net sales | Licensee will spend the greater of 20% of the Minimum Net Sales or 20% of the actual Net Sales per contract year towards advertising and promotion<br><br>Restricted to "First Tier Retailers" |

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY

Tab 6

| No. | Licensor | Licensor Description | Licensee | Date | Term | Licensed Trademark(s) | Products Detail | Licensed Use | Exclusivity | Territory | Upfront Fee | Royalty (low) | Royalty (high) | Minimum Royalty | Royalty Base | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7 | QS Holdings SARL | Designer, manufacturer, and promoter of a vast line of clothing, accessories, and sports equipment stemming from a board riding heritage | Inter Parfums, Inc. | 3/23/2006 | 12 years | QUIKSILVER and ROXY; and the associated logos | Perfume, cosmetic, toiletry and face-care and skin-care products | For designing, developing, manufacturing, selling, distributing and marketing the Products | Exclusive | Worldwide | | 7% | 20% | €300,000, beginning in the second full year of the agreement and increasing by €100,000 every two years | Wholesale price Net sales | 20% royalty rate applies to sales made by the Licensee to franchises or otherwise affiliated retail outlets of the Licensor Licensor wishes to expand more into the area of cosmetics, skin care, and perfumes |
| 8 | Retail Brand Alliance, Inc., d/b/a/ Brooks Brothers | Clothing retailer | Inter Parfums USA, LLC. | 11/26/2007 | 6 years (with 5 year extension term) | Hanging Lamb Design, Brooks Brothers, BB and Design, Golden Fleece Collection and Design, and 346 | Fragrances (including body lotion and cream), cosmetics, home fragrance, and skincare products (including creams and lotions) | For the development, production, manufacture, distribution, and sale of the Licensed Products | Exclusive (Licensor's retail and factory stores, and duty-free channels) Non-exclusive conditions outside U.S. and Puerto Rico | Worldwide | | 6% | 10% | $170,000, beginning in the second year of the agreement, and increasing to $352,573 by the tenth year | Wholesale sales Ex factory sales | The Wholesale Sales Royalty is 6% and the Ex Factory Sales Royalty is 8-10% Licensee agrees to spend at least 25% of Net Sales or 25% of the prior year's Net Sales on marketing |
| 9 | Gucci | Italian luxury brand of fashion and leather goods | Procter & Gamble Co. | June 2006 | 5 years (renewed in 2011) | GUCCI | Personal beauty | | Yes | | | 9% | 9.5% | | | |

| | | |
|---|---|---|
| Minimum | 4.0% | |
| Median | 6.5% | 7.0% |
| Maximum | 20.0% | |
| 3rd Quartile (75% under) | 7.0% | 7.8% |
| 1st Quartile (25% under) | 5.0% | 5.0% |

Excluding Agreement No. 9

**Notes & Sources:**

[1] License Agreement among Aerin LLC, Aerin Lauder Zinterhofer and Estee Lauder Inc., April 6, 2011; and <www.bloomberg.com>.

[2] Trademark License Agreement among Guess?, Inc., Guess? IP Holder L.P. and Parlux Fragrances, Inc., November 1, 2003.

[3] CCA Industries Inc., Form 10-K, for the fiscal year ended November 30, 2013; and <www.linkedin.com/in/ellensirot>.

[4] License Agreement between I|M1, LLC and NuGene International, Inc., March 31, 2017; and Level Brands, Inc. Prospectus, April 9, 2019, page 3.

[5] License Agreement between J Choo Limited and Inter Parfums SA, September 29, 2009.

[6] License Agreement between Nine West Development Corporation and Inter Parfums USA, LLC, July 21, 2010; and <www.bloomberg.com>.

[7] Trademark Licensing Agreement between QS Holdings SARL and Inter-Parfums, March 23, 2006.

[8] Manufacturing and License Agreement between Retail Brand Alliance, Inc., d/b/a Brooks Brothers and Inter Parfums USA, LLC, effective 2008; and Inter Parfums, Inc. Form 8-K, November 26, 2007.

[9] "Gucci, Guess Square Off in Trademark Dispute," *Women's Wear Daily* (Section: 1, Pg. 1, Vol. 203, No. 65 ISSN: 0149-5380), March 29, 2012; and Kerry Olsen, "Gucci, Procter & Gamble Extend Pact," *Women's Wear Daily*, January 27, 2011.

# Tab 7

# Sol de Janeiro Brazilian Bum Bum Cream Financial Data

| Description | 2016 | 2017 | 2018 | 2019 | 2020 [1] | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| **Sales (U.S.)** | $1,934,536 | $3,309,984 | $5,247,521 | $8,258,768 | | | | **$100,348,516** |
| **Net Sales (U.S.)** | | | | | $18,521,917 | $29,023,505 | $34,052,284 | |
| Cost of Goods Sold | | | | | $2,549,303 | $6,019,762 | $6,503,195 | |
| Gross Margin | | | | | $15,972,614 | $23,003,743 | $27,549,089 | |
| *Gross Margin Percent* | | | | | *86%* | *79%* | *81%* | |
| Total Channel Marketing | | | | | $3,023,966 | $3,977,787 | $4,706,603 | |
| Total Warehouse Fulfillment | | | | | $1,429,362 | $2,227,399 | $2,480,523 | |
| Contribution Margin | | | | | $11,519,286 | $16,798,557 | $20,361,962 | |
| *Contribution Margin Percent* | | | | | *62%* | *58%* | *60%* | |

**Notes & Sources:**

2016-2019: SDJ 0002370, and 2020-2022: SDJ 0001654, at Tab "US BBC."

[1] I understand that in 2020 Sol de Janeiro changed its accounting system to Net Suite (Deposition of Atsushi Hayakawa, September 14, 2023, page 88).

Brazilian Bum Bum Cream U.S. sales: approximately 70% at Sephora, 15-20% through Amazon, and 10-15% through soldejaneiro.com
(Deposition of Atsushi Hayakawa, September 14, 2023, page 69-70).

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY

Tab 7

# Tab 8

# Sol de Janeiro Brazilian Bum Bum Cream Adv. & Mkt. Spend Data

| Description | 2018 | 2019 | 2020 | 2021 | 2022 | PY 2023 | Total |
|---|---|---|---|---|---|---|---|
| Audio | | | $9,560 | $44,097 | $138,022 | $374,359 | $512,381 |
| Bing | | | | $71,740 | $8,942 | $134,339 |
| Google | $109,464 | $285,058 | $712,903 | $1,215,073 | $1,098,926 | $233,981 | $3,655,406 |
| Facebook | | | $245,913 | $836,813 | $1,014,612 | $397,976 | $2,495,314 |
| Pinterest | | | $4,344 | $37,515 | $110,701 | $44,144 | $196,705 |
| Snapchat | | | | $41,623 | $132,725 | $69,215 | $243,563 |
| TikTok | | | | $21,333 | $682,002 | $360,010 | $1,063,344 |
| **Total** | $109,464 | $285,058 | $972,721 | $2,196,454 | $3,248,728 | $1,488,626 | **$8,301,051** |

**Notes & Sources:**

SDJ 0001642, at Tab "Spend Summary."

[1] I understand this spend is associated with only Brazilian Bum Bum Cream, as well as when Brazilian Bum Bum Cream is grouped with other Sol de Janeiro products (Deposition of Heela Yang Tsuzuki, September 12, 2023, page 232).

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY

Tab 8

# Tab 9

# Sol de Janeiro Retailers

| Retailer | Year Launched | Country | Brick & Mortar | No. of B&M Stores | Online |
|---|---|---|---|---|---|
| SiJCP | 2016 | USA | Yes | 616 | |
| Sephora US | 2016 | USA | Yes | 465 | Yes |
| Planet Beauty | 2015 | USA | Yes | 22 | Yes |
| UrbanWaxx | 2016 | USA | Yes | 8 | |
| Exhale Spa | 2016 | USA | Yes | 6 | |
| CO Bigelow | 2015 | USA | Yes | 1 | Yes |
| Beauty Box | 2016 | USA | Yes | 1 | Yes |
| Local Fixture | 2016 | USA | Yes | 1 | Yes |
| Piana | 2016 | USA | Yes | 1 | Yes |
| White's Apothecary | 2018 | USA | Yes | 1 | |
| B-Glowing | 2015 | USA | | | Yes |
| soldejaneiro.com | 2015 | USA | | | Yes |
| Alrossa | 2016 | USA | | | Yes |
| Dermstore | 2017 | USA | | | Yes |
| Revolve | 2017 | USA | | | Yes |
| Beautylish | 2018 | USA | | | Yes |
| Amazon | 2020 | USA | | | Yes |
| | | | | 1,122 | |

**Notes & Sources:**

SDJ 0001641, at Tab "All."

Data as of Fall 2022. I understand that Sol de Janeiro products are now sold in 886 Kohl's stores, and no JCPenney stores (Interview of Haley Menkis, Brand & Product Consultant for Sol de Janeiro).

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY

Tab 9